UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>    v.<br><br>DOMINIC MCCARNS,<br><br>          Defendant. | No. 2:08-cr-00116-KJM<br><br>ORDER |

        This matter is before the court on defendant's renewed request for release on bail, after his trial and conviction for conspiracy to commit mail fraud, pending sentencing. The government opposes the motion. The court heard oral argument on February 5, 2014. Jan David Karowsky appeared for Mr. McCarns, who was present, in custody, and Assistant U.S. Attorney Michael D. Anderson appeared on behalf of the government. After consideration of the parties' arguments, the case file, and the applicable law, the court denies defendant's motion for the reasons stated below.

I.    BACKGROUND

        Mr. McCarns was indicted in 2008 for conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349, and he was found guilty by jury in December 2013. In the approximately five-and-a-half years' time between indictment and his conviction, Mr. McCarns was released on bail, and he made all of his required court appearances.

/////

After the jury verdict, the government moved for Mr. McCarns' remand. The court considered argument from defense counsel and from the government. The court also considered information provided by the government on a number of law enforcement contacts Mr. McCarns had incurred without reporting the contacts to his Pretrial Services Officer. The court found defendant had not overcome the burden that had shifted to him upon conviction, to show he does not pose a danger to others or the community under Federal Rule of Criminal Procedure 46 and 18 U.S.C. § 3143; the court ordered Mr. McCarns remanded into custody.

Mr. McCarns moved to reopen the issue of detention pending sentencing. Over objection, the motion to reopen was granted in light of new information related to Mr. McCarns' law enforcement contacts. Mr. McCarns and the government have submitted briefs that offer sharply divergent versions of defendant's conduct over the course of his five years on release awaiting trial and recently in custody. These conflicting narratives are recounted separately below.

A.  Mr. McCarns' Version of Events

Mr. McCarns argues he should be released pending sentencing because he "is neither violent nor a flight risk," and it will take over a year for defense counsel to prepare a motion for new trial and to prepare to try the second set of pending charges. (Dominic McCarns' Detention Hr'g Mem. ("Def.'s Mem.") at 10:1–19, ECF No. 493.)

Mr. McCarns takes issue with the government's characterization of his alleged domestic violence incidents. Mr. McCarns concedes the facts contained in a police report of defendant's Los Angeles arrest in November 2012 "appear to show some significant domestic violence committed by [defendant] against L.L." (*Id.* at 3:20–22.) However, Mr. McCarns provides context to explain the incident as one episode in a larger and turbulent romantic affair, militating against a finding of dangerousness.

Specifically, Mr. McCarns portrays his relationship with L.L. as tumultuous and punctuated by eruptions often fueled by L.L.'s alcohol consumption. According to Mr. McCarns' former roommate Reyes, L.L. is "very sweet"—that is, "unless [she] was drinking alcohol." (Def.'s Mem., Ex. B, at 2, ECF No. 493-2.) Reyes states he witnessed "episodes of [L.L's] wild drunken and in-your face behavior towards" defendant, who for his part "never would engage [L.L.] in any kind of physical

2

altercation or fighting." (*Id.*) According to L.L. herself, she "picks fights [with defendant] only when she is drunk," and L.L. admits "that she has done this at least 20 times in the year and a half of their romantic relationship." (*Id.* at 3.)

According to L.L. and Tereno, L.L.'s and Mr. McCarns' mutual friend, the incident on November 20, 2012, leading to Mr. McCarns' arrest was one of these episodes. That night was Tereno's 25th birthday, and she asked defendant and L.L. to join her at a club in Hollywood, California. According to Tereno, L.L. consumed "between 4–5 Long Island ice tea[s]" and "at least 3 shots of Tequila." L.L. for her part remembers drinking "at least 7–8 Long Island ice teas." (*Id.* at 3.) L.L. "explains that she has a high tolerance for alcohol." (*Id.* at 1.) Tereno, however, witnessed L.L. "stagger into the bar restroom and accidentally spill her drink onto another lady. One thing lead to another and . . . the two women were fighting" until a security guard, onlookers, and Mr. McCarns "broke up the fight. By this time [L.L.] was 'wasted,' and had some scratches and a fat lip." (*Id.* at 1.) According to Tereno, L.L. "had too many drinks and became belligerent and loud." (*Id.*) L.L. herself remembers that "she was very drunk and something happened next to the bathroom where she got into a fight with two or three women in the bar." (*Id.* at 3.)

According to L.L. and Tereno, L.L. "got the keys to [Mr. McCarns'] car . . . somehow," and while Mr. McCarns took a cab to get back to Costa Mesa, L.L. drove Mr. McCarns' car. (*Id.* at 1, 3 .) L.L. then chased Mr. McCarns' cab until the cab driver pulled over. At some point, the police arrived, and both L.L. and Mr. McCarns were arrested. L.L. says she "remembers only very little because she was so drunk." (*Id.* at 3.) The police asked L.L. how she got the fat lip and scratches, and she told them she was in a fight at a bar in Hollywood; but "the police stated they did not believe her story because she made the 911 call stating her boyfriend hit her." (*Id.*)

The Los Angeles County Sherriff's Department's supplementary incident report largely confirms Mr. McCarns' version of events. Detective Preston recorded his report of his interviews with Mr. McCarns and L.L. (Def.'s Mem., Ex. A, at 1, ECF No. 493-1.) According to Preston, Mr. McCarns said he did not hit L.L.: "All I did was drag her out of my car because she embarrassed me at the club!" (*Id.*) L.L. said she and defendant were kicked out of the club because she "got into an argument with an unknown female at the dance club" and "was hit by the female." (*Id.*) On the drive home, Mr. McCarns

3

1  drove with L.L. in the passenger's seat, at which point L.L. "said she pulled at the steering wheel and
2  attempted to cause the car to collide with the center median on the freeway." (*Id.*)  L.L. explained "the
3  high amount of liquor she had consumed weakened her decision making." (*Id.*)

4  Mr. McCarns also takes issue with the government's claim that four other incidents of
5  reported domestic violence show he is violent.  Mr. McCarns contends these incidents occurred at his
6  apartment "at the upscale, Villa Siena Apartments," in Irvine, California.  These incidents, Mr. McCarns
7  argues, arose from neighbors' complaints about noisy arguments during "quiet hours."  (Domonic
8  McCarns' Supplemental Detention Hr'g Mem. ("Def.'s Supp. Mem.") at 2:1–23, ECF No. 508.)
9  Moreover, Mr. McCarns points out he was not arrested and the police noted "no crime occurred."
10 Mr. McCarns contends the reports occurred in part because he is black, and "African Americans constitute
11 1.8% of the population in Irvine, California."  (*Id.* at 3:5–14.)

12 Mr. McCarns further asserts the government's allegations of financial "structuring"
13 allegedly perpetrated by Mr. McCarns from jail, described in greater detail below, are false.  Mr. McCarns
14 explains that at one point in the recent past he was the victim of identity theft.  As a result, his bank
15 account at Wells Fargo was being monitored for fraud: emails from Wells Fargo appear to confirm some
16 false charges, which were credited back to McCarns' bank account.  (Def.'s Supp. Mem., Ex. J, ECF No.
17 508-10.)  Mr. McCarns argues that when he was instructing L.L. not to withdraw more than $5,000 at a
18 time or "they will report it," he was referring to the bank's automatic fraud monitoring implemented after
19 the fraud on his account.  He provides no other evidence besides the e-mails to substantiate the $5,000
20 threshold for triggering a fraud monitoring protocol.  Mr. McCarns does point out that the Federal Bank
21 Secrecy Act imposes reporting requirements for transactions greater than $10,000, not $5,000.  (Def.'s
22 Supp. Mem. at 3, ECF No. 508.)[1]  Defendant claims he instructed L.L. to withdraw money "to hire a new
23 attorney, if possible."  (*Id.* at 5:3–6.)
24 ///

---

[1] Mr. McCarns does not provide a citation to the provision of the "Bank Secrecy Act" containing this requirement; however, exchanges of "currency of more than $10,000" do trigger the filing of a Currency Transaction Report under regulations promulgated by the Federal Reserve Board.  31 C.F.R. § 1010.311 ("Each financial institution . . . shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000 . . . .").

Mr. McCarns also points out that he has "extensive ties to Southern California" because "two of his children live there" as do "his mother, father, two brothers, his sister, and aunts and uncles on both sides of the family." (*Id.* at 7:2–4.)

### B. The Government's Description of Mr. McCarns' Conduct

The government opposes Mr. McCarns' postconviction release pending sentencing, explaining that, in the government's view, Mr. McCarns' pretrial conduct evinces he is "dangerous" and "actively trying to deceiving the court." (Gov't's Opp'n to McCarn's Post-Conviction Mot. to Reopen Bail ("Opp'n") at 3:12–13, ECF No. 476.) As an initial matter, the government notes Mr. McCarns' prior criminal history, which it characterizes as serious, and his conviction in this case based on a jury finding "that [defendant] intended to deceive or cheat homeowners out of their equity." (*Id.* at 2:6–16.) The government also directs the court's attention to Mr. McCarns' behavior on release awaiting trial and postconviction.

The government claims Mr. McCarns actually committed several acts of domestic violence, and then either failed to notify his Pretrial Services Officer about these incidents, or actively tried to conceal them. One of the conditions of Mr. McCarns' release required him to notify Pretrial Services of any contacts with law enforcement. As noted above, on four occasions while Mr. McCarns was on release, the police were called to his apartment in Irvine, California, in response to reports of domestic violence involving Mr. McCarns; Mr. McCarns was not arrested on any of these four occasions. The police did arrest Mr. McCarns in Los Angeles, California, on domestic violence charges on November 21, 2012, reporting that he hit his current girlfriend, L.L., "causing visible injuries while traveling in a car after leaving a club in Los Angeles." (*Id.* at 3:17–21.) The government contends Mr. McCarns not only failed to report this arrest to Pretrial Services, but he actively "worked to conceal" it by coordinating with L.L. Specifically, the government points to telephone conversations between Mr. McCarns and L.L. from jail, while defendant was in custody postconviction, in which the government contends Mr. McCarns "instructed L.L. to lie to [Pretrial Services] Officer Walker and state that she was not aware of any arrests." (*Id.* at 3:22–4:5.) The government argues this court should conclude Mr. McCarns' domestic violence incidents, including the incident leading to arrest, show he is dangerous; his lying about them

///

1 shows defendant "cannot be trusted to comply with the [c]ourt's conditions" on release awaiting
2 sentencing.  (*Id.* at 3:13–14, 5:3–5.)

3 The government also claims Mr. McCarns "has continued to commit crimes in custody,"
4 pointing to what the government contends are various "codes and techniques" through which Mr. McCarns
5 communicated to and coordinated with L.L. to smuggle contraband and evade bank reporting
6 requirements.  (*Id.* at 5:7–21.)  Specifically, the government contends McCarns encouraged L.L. to
7 smuggle in a pencil during jail visits, which "may constitute a violation of California law," and "persuaded
8 L.L. to assist him in the crime of structuring transactions to evade bank reporting requirements" in
9 violation of federal law.  (*Id.* at 5:11–15.)  The government draws this inference from a series of telephone
10 conversations, in which McCarns tells L.L. not to withdraw more than $5,000 at a time from the bank or
11 "they will report it," and discusses closing a "corp."  (*Id.* at 5:23–6:10.)  The government also surmises
12 from gaps in conversations during L.L.'s jail visits that, not only were L.L. and defendant coordinating via
13 code, but were specifically violating federal laws prohibiting financial structuring.  (*See id.* at 6:3–5
14 (stating defendant and L.L. discussed "other money, followed by a long silence punctuated with L.L.
15 repeatedly indicating affirmation or understanding (presumably while they write on the glass).").)  The
16 government contends these communications "illustrate[] the extreme narcissism and untrustworthiness of
17 this defendant," such that there "is simply no reason to believe . . . his respect for strangers, girlfriends,
18 pretrial services, or the [c]ourt would increase with his release . . ." (*id.* at 6:15–18).  The government does
19 not make clear how these personal qualities, if they even accurately describe Mr. McCarns, map onto the
20 relevant criteria of flight risk or dangerousness.

21 Finally, the government argues Mr. McCarns is a flight risk because he faces a sentence of
22 up to 20 years in prison for his conspiracy to commit mail fraud.  The government also points out that, in
23 addition to the sentence that will be imposed based on Mr. McCarns' conviction in the present case,
24 McCarns also faces a second trial for similar conduct during an earlier time period on charges of
25 conspiracy to commit mail fraud and mail fraud carrying a possible maximum sentence of an additional 40
26 years in prison.  The government predicts conviction in the next trial is likely, in part, because the
27 government will be able to "introduce Rule 404(b) evidence from the last trial in the next trial." (*Id.* at
28 ///

6

1   7:19–26.) The government asks the court to conclude from this information that defendant has "a

2   substantial incentive to flee." (*Id.* at 8:5.)

3   II.     STANDARD

4           Federal Rule of Criminal Procedure 46(c) conditions postconviction eligibility for release

5   pending sentencing on satisfaction of the provisions of 18 U.S.C. § 3143. FED. R. CRIM. P. 46(c) ("The

6   provisions of 18 U.S.C. § 3143 govern release pending sentencing . . . ."). Rule 46(c) makes clear that

7   "[t]he burden of establishing that the defendant will not flee or pose a danger to any other person or to the

8   community rests with the defendant." 18 U.S.C. § 3143 provides, in pertinent part:

> [T]he judicial officer shall order that a person found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released.

12  *Id.* § 3143(a)(1); *accord United States v. Whitlock*, No. 11-cr-00736, 2011 WL 4852308, at *3 (D. Ariz.

13  Oct. 13, 2011) (citing *United States v. Oliver*, No. 1:09-cr-00535, 2010 WL 5401435, at *2–3 (N.D. Ohio

14  Dec. 23, 2010) (denying postconviction request for release on bond pending sentencing to care for

15  defendant's children due to children's mother's ill health); *United States v. Mellies*, 496 F. Supp. 2d 930

16  (M.D. Tenn. 2007)). Thus, "[section] 3143(a) creates a presumption in favor of detention pending

17  sentencing." *United States v. Marks*, 947 F. Supp. 858, 863 (E.D. Pa. 1996) (citing *United States v. Miller*,

18  753 F.2d 19, 22 (3d Cir. 1985) ("The Bail Reform Act of 1984 was enacted because Congress wished to

19  reverse the presumption in favor of bail that had been established under the prior statute, the Bail Reform

20  Act of 1966.")).

21          A defendant may rebut this presumption if he establishes "by clear and convincing

22  evidence that he [is] not likely to flee or pose a danger to the safety of any other person or the community

23  if released." *United States v. Richards*, 915 F.2d 1556, 1556 (1st Cir. 1990) (per curiam) (unpublished

24  disposition). "Clear and convincing evidence means something more than a preponderance of the

25  evidence and something less than beyond a reasonable doubt." *Marks*, 947 F. Supp. at 863 (quoting

26  *United States v. Mustakeem*, 759 F. Supp. 1172, 1177–78 & n.7 (W.D. Pa. 1991)); *see also United States*

27  *v. Londono–Villa*, 898 F.2d 328, 329 (2d Cir. 1990) (per curiam) (reversing the district court's finding, by

28  ///

clear and convincing evidence, that defendant did not pose flight risk pending sentence as "clearly erroneous").

III.     ANALYSIS

Mr. McCarns requests postconviction release pending sentencing, arguing there is clear and convincing evidence he "is neither violent nor a flight risk." (Def.'s Supp. Mem. at 7:18–22, ECF No. 508.) Any flight risk, Mr. McCarns argues, can be mitigated by conditions of release such as electronic monitoring. The government argues Mr. McCarns has a history of violence and that the potential weight of Mr. McCarns' likely sentence based on his conviction, and future trial on a separate indictment, make him an acute flight risk.

The court has carefully considered the parties' submissions, including tape recordings of Mr. McCarns' jail-visitation and telephone conversations with L.L. submitted by the government. The court finds little support for the government's hyperbolic accusations of structuring by Mr. McCarns, from jail, through coordination with L.L. Mr. McCarns' explanation, that he was arranging to obtain money to hire a new lawyer and to avoid fraud monitoring at his bank, is more plausible, although not entirely supported by clear evidence either, given the lack of support for a $5,000 trigger used by the bank for fraud monitoring.

At the same time, the court finds the larger context of Mr. McCarns' relationship with L.L. undercuts a finding that Mr. McCarns is dangerous to L.L. or others. The record is consistent with Mr. McCarns' contention that the domestic-violence calls reflected a larger tumultuous relationship with L.L., with L.L. often the instigator and without his incurring any charges.

Mr. McCarns' significant family ties and two children in Southern California also tend to mitigate his flight risk. Additionally, Mr. McCarns has made all of his required court appearances over the course of the last five years, even after being told by his attorney he was likely to lose at trial.

Considering all of the information before the court, however, the court finds that Mr. McCarns' failure to comply with critical conditions of his pretrial release make it less likely he will comply with those conditions following his conviction. *Cf. United States v. Bararia*, No. 2:12-cr-00236, 2013 WL 1907782, at *4–5 (D. Nev. Mar. 12, 2013) (denying release because the defendant's "prior violations of his release conditions" make it unlikely he will "abide by any condition of release" that

would otherwise mitigate flight risk).  The fact remains Mr. McCarns had several contacts with police on pretrial release that he either did not report to his assigned Pretrial Services Officer, or did so reluctantly, tardily, or only in response to direct questioning.  These contacts included one arrest for domestic violence, even though charges were later dropped.  Regardless of the ultimate disposition of charges, or the demographics of the area in which Mr. McCarns lives and works, it is not for him to determine what contacts are reportable.  Given that none of the contacts resulted in charges or convictions, it appears in fact Mr. McCarns had little or nothing to lose by being completely forthcoming.  Mr. McCarns' suggestion from jail that L.L. mislead his Pretrial Services Officer, as accurately characterized by the government, dooms his argument that he can be trusted to comply with any and all conditions imposed if he were released again.  Moreover, the severity of defendant's pending sentence, and his possible future conviction, further preclude a finding that Mr. McCarns does not pose a flight risk.  *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (affirming district court's denial of pretrial release because the district court "reasonably concluded that defendants were flight risks" after "consideration of the penalties," because "it is reasonable [for the court] to look at the potential maximum sentences [defendants] face if they were found guilty on each count and sentenced consecutively" to evaluate their flight risk).

Mr. McCarns has not met his burden to show by clear and convincing evidence he is "not likely to flee . . . if released." 18 U.S.C. § 3143(a)(1); FED. R. CRIM. P. 46(c).

IV.   CONCLUSION

For the foregoing reasons, defendant's request for postconviction release on bail pending sentencing is DENIED.

IT IS SO ORDERED.

DATED:  March 25, 2014.

_____
UNITED STATES DISTRICT JUDGE

9