1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                    No.  2:08-cr-0116 KJM

12                  Plaintiff,

13          v.                                     ORDER

14   DOMONIC MCCARNS,

15                  Defendant.

16

17

18          Defendant Domonic McCarns has proceeded through counsel with a motion for

19   new trial based on Federal Rule of Criminal Procedure 33, claiming he received constitutionally

20   ineffective assistance of counsel.  ECF No. 712.  Defendant also requested an evidentiary hearing

21   to explore trial counsel's reasoning "relative to the allegations the defense has leveled" against

22   that counsel.  ECF No. 726 at 4.[1]  The government opposed the motion and the request for

23   evidentiary hearing, and defendant filed a reply brief.

24   /////

25   /////

26   _____

27          [1] In this order, all citations to ECF page numbers are to the page number assigned by the
     court's Electronic Case Filing (ECF) system and not to specific page numbers within the cited
28   document.

                                              1

1    On October 27, 2015, the parties were ordered to show cause why defendant's

2    motion for new trial should not be denied without prejudice to defendant's right to pursue his

3    claims of ineffective assistance of counsel in collateral proceedings under 28 U.S.C. § 2255.  ECF

4    No. 745.  Both parties timely responded to the order to show cause.  ECF Nos. 751, 752.  On

5    December 9, 2015, the court heard argument, ECF No. 755, and by order filed December 29,

6    2015, the order to show cause was discharged and in lieu of an evidentiary hearing defendant was

7    granted leave to depose his trial counsel, James Greiner (hereafter Greiner).  ECF No. 758 at 3-4.

8    The order placed specific limitations on the deposition.  *Id*.  Trial counsel was deposed on

9    February 9, 2016.[2]  Thereafter, the parties filed further briefing in support of and opposition to the

10   motion for new trial.  ECF Nos. 779, 780, 783.  The court heard argument on the motion on May

11   11, 2016 and took the motion under submission.  On June 29, 2016, the court denied the motion

12   in a summary oral ruling from the bench.  ECF No. 790.  For the reasons explained in this order,

13   that ruling is confirmed.

14   I.    LEGAL STANDARDS

15        A.    Motion for a New Trial under Fed. R. Crim. Proc. 33

16        Federal Rule of Criminal Procedure 33 authorizes the court, on motion of a

17   defendant, to "vacate any judgment and grant a new trial if the interest of justice so requires."

18   Fed. R. Crim. P. 33(a).  The court has discretion to consider a claim of ineffective assistance of

19   counsel on a motion for new trial, *see United States v. Steele*, 733 F.3d 894, 897 (9th Cir. 2013),

20   and, for the reasons set forth in the December 29, 2015 order, has decided to review defendant's

21   ineffective assistance of counsel claims on the merits of the Rule 33 motion now pending before

22   the court.  *See* ECF No. 758 at 3.

23        B.    Conspiracy to Commit Mail Fraud In Violation of 18 U.S.C. § 1349

24        Defendant was convicted by a jury on December 2, 2013 of conspiracy to commit

25   mail fraud in violation of 18 U.S.C. § 1349.  ECF No. 466.  The elements of conspiracy are "an

26   _____

27        [2] On April 21, 2016, the court received a copy of the transcript of trial counsel's
     deposition and a DVD recording of the deposition.  The Clerk of the Court will be directed to
28   maintain both until further order of the court.

2

1  agreement between two or more persons to accomplish an illegal objective, coupled with one or

2  more overt acts in furtherance of the illegal purpose." *United States v. Hubbard*, 96 F.3d 1223,

3  1226 (9th Cir. 1996).

> "[I]nferences of the existence of such an agreement may be drawn 'if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.'" *United States v. Melchor–Lopez*, 627 F.2d 886, 890 (9th Cir.1980) (quoting [*United States v.*] *Monroe*, 552 F.2d [860] at 862–63 [(9th Cir. 1977)). "The agreement need not be explicit, but may be inferred from circumstantial evidence." *Id.* at 891. Once evidence of a conspiracy is established, only a slight connection between the defendant and the conspiracy is necessary to convict the defendant of knowing participation in the conspiracy. *Id.*; *United States v. Aichele*, 941 F.2d 761, 763 (9th Cir.1991). However, mere association with members of a conspiracy or knowledge of the conspiracy, "without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator." *Melchor–Lopez*, 627 F.2d at 891.

12  *Id.* The crime of mail fraud has two elements:  "1) existence of a scheme to defraud, and 2) using

13  or causing the use of the mails in furtherance of the scheme." *Id.* at 1227-28. "'To be part of the

14  execution of the fraud … the use of the mails need not be an essential element of the scheme….

15  It is sufficient for the mailing to be 'incident to an essential part of the scheme' … or 'a step in

16  the plot.'" *Id.* at 1228 (quoting *Schmuck v. United States*, 489 U.S. 705, 711-12 (1989)).

17       C.    <u>Ineffective Assistance of Counsel</u>

18       The federal law on claims of attorney ineffectiveness is clear:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

22  *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be

23  whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments supported the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Id.* at 690-91.  The court must presume that counsel acted effectively and evaluate strategic decisions to determine whether they were "reasonable at the time."  *Harrington v. Richter*, 562 U.S. 86, 107 (2011); *see also Strickland*, 466 U.S. at 689 (internal citation omitted) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'").

In *Harrington,* the Supreme Court emphasized the deference *Strickland* requires, noting that a court must presume that counsel acted effectively and reiterating that "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  562 U.S. at 105.

It also is petitioner's burden to establish prejudice: "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

"Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other."  *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002); *see also Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998) ("[It] is unnecessary to consider the prejudice prong of *Strickland* if the petitioner cannot even establish incompetence under the first prong.")

II.    ANALYSIS

A.    Relevant Background

The Superseding Indictment in this case alleges that between March 19, 2005 to at least June 30, 2006, defendant McCarns conspired with multiple co-defendants "to target homeowners in financial distress and perpetrate an 'equity stripping' scheme and artifice to defraud" the homeowners and "to obtain property and money by means of materially false and

4

fraudulent pretenses, representations, and promises, and to use the United States Mails and any private and commercial interstate carrier to execute the scheme. . . ." ECF No. 153 at 2, 4. The scheme was run through Head Financial Services (HFS), a company incorporated by co-defendant Charles Head (Head) in August 2001, *id*. at 2, and Creative Loans, LLC (Creative Loans), created by Head in June 2004. *Id*. at 3. "Other business entities" also were involved in the scheme, including property management entities known as Nations Property Management and A-One Property Investments. *Id*. Defendants also "used other business names and websites to perpetuate the fraud, including but not limited to Foreclosure.com, Funding Foreclosure[3], and $30kperyear.com." *Id*.

McCarns was tried with two co-defendants, Charles Head and Benjamin Budoff. The government's case-in-chief against McCarns consisted of documentary evidence and testimony from homeowner witnesses and company insiders. The government called several other witnesses at trial to offer testimony against Head and/or Budoff. In his motion for new trial, McCarns contends he received constitutionally ineffective assistance of counsel as a result of trial counsel's failure to object to the admission of three government exhibits, Exhibits 60, 68, and 70; by counsel's failure to adequately cross-examine and impeach both homeowner and company witnesses; and by his failure to seek an order from the court granting immunity to exculpatory witnesses who planned to assert their Fifth Amendment rights against self-incrimination. The government argues counsel was not ineffective in handling the exhibits that are the focus of McCarns' motion, Exhibits 60, 68, and 70, contending counsel "deflected their sting by making clear to the jury that they were not found with or possessed by McCarns." ECF No. 724 at 15. The government also argues that counsel's examination of the homeowner witnesses was "exhaustive" and not ineffective, *id*. at 19, and that the way counsel handled the company insider witnesses also was within the bounds of competent professional assistance, *id*. at 27. Finally, the government contends the proposed motion to compel immunity would have failed and counsel

---

[3] This business entity appears to be referred to at times as Funding Foreclosure and at times as Funding Foreclosures throughout this record.

5

1   therefore was not ineffective in failing to seek immunity for the potentially exculpatory witnesses.

2   *Id*. at 30-33.

3           In his opening statement, McCarns' trial counsel introduced the jury to the two

4   part "theme" of the defense:  "No connection.  Put it in writing."  ECF No. 548 at 44.  He

5   explained that the evidence would show no connection between McCarns and the fraud

6   conspiracy charged by the government.  *Id*.  Second, he argued that written evidence would

7   contradict the government's assertions of alleged false statements by McCarns, and would show

8   that everything McCarns sold to the homeowners was put into written documents sent to

9   homeowners to read and review before signing, and that there would be other documents

10  demonstrating that some of the government's assertions were false.  *Id*. at 44-46.  At his

11  deposition taken in connection with the pending motion, counsel testified extensively concerning

12  his use of this strategy with respect to exhibits offered by the government and cross-examination

13  of both homeowner and company witnesses.  *See*, *e.g.*, Greiner Dep. at 65-68, 72-73, 75, 79-81,

14  92-96, 103, 105, 107, 132-33, 144, 157, 162, 164, 166, 175, 188, 202.  Independently, the court

15  recalls that throughout trial, trial counsel regularly paused once he had examined a witness to

16  compare notes with Mr. McCarns before yielding a witness.

17          B.      Exhibits 60, 68 and 70

18                  1.      Background re "Open" and "Secret" Fraud Periods

19          A substantial part of defendant's motion is grounded in his contention that from

20  January 2004 to December 2004, Head "ran a business based exclusively on fraud," ECF No. 712

21  at 19, and that by the time McCarns was hired as a sales agent in February 2005, "Head was using

22  a completely different business model."  *Id*. at 22.  Defendant contends the post-2004  business

23  model only involved fraud by Head and "company managers" and not by "sales agents,"

24  including McCarns.  McCarns contends sales agents, including him, "were not instructed to

25  deceive the homeowners at all" and "uniformly believed they were selling a legitimate product,

26  helping homeowners, and had no idea that fraud was being committed against financial

27  institutions by Charles Head and his managers."  *Id*.  This premise underlies the first part of

28  McCarns' ineffective assistance of counsel claim, specifically, his contention that counsel was

ineffective in failing to object to the admission of three documents, Exhibits 60, 68, and 70.[4]

McCarns argues these three documents were integral to the government's case against him and

highly prejudicial. Specifically, defendant contends these three documents were linked by the

government to testimony from homeowners to whom McCarns sold the foreclosure rescue

program but were created and used only during the time prior to McCarns' employment.

At the outset, the court notes that at deposition, trial counsel responded to

questions about the business model used by Charles Head during 2004, the so-called "50/50 split

with the LLCs."  Greiner Dep. at 46.  This is the business model McCarns contends was an "open

fraud" involving all of Head's employees and which he contrasts with the supposed "secret fraud"

during the period of his employment, which he contends only involved management and not him

or other sales agents.  *Id.*; *see also* ECF No. 712 at 19-23.

When questioned during his deposition about this distinction and an exhibit that

might have been used to highlight differences between the two periods, trial counsel responded

that he had determined not to draw a distinction between the conduct of 50/50 employees and

McCarns because (1) there had been a limiting instruction that the testimony of two witnesses,

Shannon Taylor and Justin Wiley, were admitted as to Head only and could not be used against

McCarns; and (2) McCarns had not worked at Head Financial Services during the 50/50 time

frame, and he "made that clear in [his] opening and . . . in [his] closing."  Greiner Dep. at 46-47;

*see also* ECF No. 548 at 37-44; ECF No. 562 at 25, 36, 40, 53-57.

Regarding counsel's first explanation, he is correct.  At the start of trial, the court

instructed the jury that "[s]ome evidence may be admitted for a limited purpose only" and that

when the court instructs the jury "that an item of evidence will be or has been admitted for a

limited purpose, you must consider it only for that limited purpose and for no other."  ECF No.

548 at 16.  During Shannon Taylor's testimony, the court instructed the jury that certain

---

[4] In the motion, defendant contends his trial counsel "stipulated into evidence" three documents, which were integral to the government's case.  ECF No. 712 at 18.  In fact, trial counsel stipulated only to the authenticity of Exhibits 68 and 70, not to their admissibility.  *See* ECF No. 431 at 5.  All three exhibits were admitted without objection.  *See* ECF No. 551 at 141; ECF No. 559 at 164.

1    documents were "admitted with respect to the Government's case against Mr. Head.  The

2    testimony is subject to the limiting instruction the court gave at the beginning."  ECF No. 549 at

3    47.  A limiting instruction also was given at the start of Justin Wiley's testimony.  *See* ECF No.

4    551 at 126 ("Ladies and gentlemen, I'm giving you an instruction you've heard before, but it

5    applies with respect to this witness as well.  I understand you are about to hear evidence that Mr.

6    Charles Head committed other acts not charged here.  You may consider this evidence only for its

7    bearing, if any, on the question of Mr. Head's intent, motive, opportunity, preparation, plan,

8    absence of mistake, absence of accident, and for no other purpose.  You may not consider this

9    evidence as evidence of guilt of the crime for which Mr. Budoff and Mr. McCarns are now on

10   trial.").

11           Regarding trial counsel's second point, the record shows that in both his opening

12   statement and his closing argument, counsel drew significant distinctions between the business

13   model of Head Financial Services during the "50/50 LLC" period in 2004, and the business

14   model to which the company transitioned just before McCarns was hired in early 2005.  *See* ECF

15   No. 548 at 37-44; ECF No. 562 at 53-56.  In his opening statement, counsel stated that when

16   McCarns arrived the business was "transforming and being compartmentalized into various

17   areas," that McCarns was an employee with no management authority, and that sales agents like

18   McCarns operated very differently than the individuals who had worked during the 50/50 era.

19   ECF No. 548 at 41.  Counsel used the anticipated testimony of Shannon Taylor to highlight one

20   of the key relevant differences:  that in 2004, Head and two of his employees came to her house

21   with documents to sign, while McCarns' job was to talk to people on the telephone.  *Id*. at  39, 44.

22   In closing, counsel argued, *inter alia* that the business model of Head Financial Services changed

23   significantly after Keith Brotemarkle was hired in January 2005, that Brotemarkle "did a

24   corporate takeover of Funding Foreclosures with Kou Yang," that Brotemarkle and Yang were

25   the two committing fraud, and that "Brotemarkle raided that company, set it up to hide his fraud

26   and Kou's fraud, and used the employees, who worked diligently at their job day in and day out"

27   and that McCarns "got physically beat up because he questioned management."  *See* ECF No. 562

28   at 54-57.

8

2.      Handling of Exhibits

Defendant's challenge to the performance of his counsel concerning trial exhibits 60, 68, and 70 is grounded in the fact that there were significant similarities between the sales pitches described in the documents and the testimony of homeowner witnesses to whom McCarns sold the program.

Exhibit 60 is a five page document entitled "Foreclosure Transaction Procedure" that details marketing mechanisms, sales pitches including a section entitled "BAIT-n-SWITCH", and procedures to follow for completing the transactions.  ECF No. 712-16.

Exhibit 68 is a document from HFS setting forth a "Sales Pitch."  It describes a program based on the equity in a customer's home, representing that HFS has investors that will (1) give the customer money to help pay bills; (2) pay all arrears on a loan "so you will be current if there is little time before your sale date"; (3) completely pay off a mortgage; and (4) "pay a firm to handle credit repair. . . ."  ECF No. 712-15.  The sales pitch represents that the customer's monthly payment will be lower than the current monthly payment and the "only real drawback" is that the investor will have to be on title with the customer for a period of time.  *Id.*  It instructs to "STRESS" that the customer will still be on title but the investor will also be on title.  *Id.* (emphasis in original).  It then provides instructions for proceeding if a customer "say[s] yes."  *Id.*

Exhibit 70 is a multipage document, which includes a two-page handwritten sample "Equity Purchase Agreement"; a one-page document with two handwritten email addresses for Charles Head; several pages of marketing efforts and costs; several pages of what appear to be sales pitches to potential customers; and a list of counties in Florida.  ECF No. 712-17; ECF No. 559 at 165-71.

Two of the three documents played a significant role in the government's case against McCarns.  In closing argument, the government argued that Exhibit 68 was "the foreclosure sales pitch."  ECF No. 561 at 144.  The government emphasized a section of the exhibit that in all capital letters instructed the sales team to "stress" to the homeowners that they would still be on title but an investor would be on title with them.  *Id.*  The government argued this instruction matched the testimony from the homeowners, all of whom testified they were told

they would remain on title, and many of whom were sold the program by McCarns.  *Id*. at 143-44.  Similarly, Exhibit 70, the government argued, corroborated the homeowners' testimony that they were told they would retain most of their equity; Exhibit 70 was the "sales pitch" for that representation.  *Id*. at 146.  The review of the homeowners' testimony provided below shows that many homeowners did testify consistently with these aspects of these exhibits.

As noted above, defense counsel stipulated to the authenticity of Exhibits 68 and 70 as part of a stipulation by the parties concerning the admissibility of trial exhibits.  ECF No. 431.  Exhibits 68 and 70 were offered into evidence through the testimony of Chris Fitzpatrick, a special agent for the Internal Revenue Service Criminal Investigation Division.  ECF No. 559 at 150, 164-65.  Special Agent Fitzpatrick testified that the documents were recovered in Charles Head's home during execution of a search warrant.  *Id*. at 164-65.  During cross-examination, McCarns' trial counsel elicited testimony from Fitzpatrick that there was no evidence either exhibit was ever given to McCarns, and that no copies of Exhibit 68 had been found at the business, or any of several other business locations.  ECF No. 560 at 82-84.  At his deposition, counsel testified he did not view Exhibit 68 as "critical" because his cross-examination "placed the document into context in front of the jury," i.e., that it was found in Heads' home office and that neither Exhibit 60 nor 68 were "critical" because "McCarns never saw them, never had them."  Greiner Dep. at 34-35.  He also testified about his closing argument and his cross-examination of Special Agent Fitzpatrick, both of which emphasized that there was no connection between McCarns and either Exhibit 68 or Exhibit 70.  *See, e.g., id*. 52, 56-57, 67-68, 70.  This approach was consistent with his two-part trial strategy discussed above:  to show no connection between McCarns and any conspiracy, and to show that written documents disproved any testimony concerning alleged false statements by McCarns.  *See*, *e.g.*, ECF No. 548 at 44-45; Greiner Dep. at 65-66.

Defendant now contends that "an informed, knowledgeable and thorough examination of Exhibit 68 by Mr. McCarns' attorney, in consultation with his client," would have provided the basis for "a potentially successful severance motion," an in limine motion limiting its admissibility only to Charles Head, or at least a more vigorous cross-examination of certain

witnesses to establish that Exhibit 68 related only to the 2004 business model.  ECF No. 712 at 27.  The record shows that trial counsel made a motion to sever raising several contentions but not relying on Exhibit 68.  ECF No. 288.  The motion was denied without prejudice.  ECF No. 297.  Given the similarities between Exhibit 68 and the testimony of several homeowners to whom McCarns sold the program, it is not at all clear that an in limine motion restricting use of Exhibit 68 to Charles Head would have been successful.  Moreover, defendant has not shown how using Exhibit 68 to support his severance motion would have resulted in a different ruling.

Trial counsel's strategy for handling Exhibits 68 and 70 was consistent with his overall trial strategy: he elicited testimony that there was no evidence McCarns had any connection to either of these documents.  This falls within "the wide range of reasonable professional assistance" that is the governing standard for this ineffective assistance of counsel claim.  McCarns has failed to demonstrate that counsel's handling of these two documents constituted ineffective assistance of counsel.

Exhibit 60 was offered into evidence through the testimony of Justin Wiley, who worked for Head Financial Services.  ECF No. 551 at 128, 141.  As noted above, the court gave a limiting instruction to the jury prior to the start of Justin Wiley's testimony.  Wiley testified that Exhibit 60 was a four-page script given to him and two others by Charles Head during two weekend meetings at Head's home in March 2004.  *Id*. at 130-31, 140-42.[5]  During Wiley's direct examination, McCarns' trial counsel interposed an objection designed to clarify that the script had only been given to Wiley and two others, not McCarns.  *Id*. at 141.  The witness clarified that "Josh Coffman, Akemi Botari" and he had gone to Head's home for the two weekends in March 2004.  *Id*. at 142.  On cross-examination, counsel elicited testimony from Wiley that he had left working for Charles Head in November 2004, prior to McCarns "ever showing up and working." *Id*. at 162-63.  In closing, the government argued that Exhibit 60 was brought in as to Charles

---

[5] Wiley initially testified that he was given a four-page script during those two weekend meetings.  ECF No. 551 at 130.  He subsequently identified Exhibit 60 as that script.  ECF No. 551 at 141.  Exhibit 60 is five pages.  ECF No. 712-16; *see also* ECF No. 551 at 141.

Head only.  ECF No. 561 at 160.  Trial counsel's handling of this document as well was not ineffective, and McCarns suffered no prejudice from its admission.

      C.    <u>Witnesses</u>

           1.    <u>Homeowner Witnesses</u>

           In its case-in-chief, the government presented seven homeowner witnesses who were victims of the charged fraudulent foreclosure program and who testified that Domonic McCarns either sold them the program or were involved in their transaction with the company. Six of these witnesses testified that McCarns had sold them the program:  Sharolynn Cardenas, Sheila Jones, Debra Kovacs, Bertha Woods, Denise Ahearn, and Kelly DiSanto.  Five testified that they always spoke with McCarns over the telephone and never met him in person, ECF No. 548 at 78, 143 (Cardenas); ECF No. 551 at 185-86 (Jones); ECF No. 553 at 195, 209 (Kovacs); ECF No. 554 at 94, 126-27 (Woods); ECF No. 554 at 174-75, 188-89 (Ahearn), and one testified simply that her contacts with McCarns were over the telephone, ECF No. 559 at 105 (DiSanto). Deborah Brockway testified that she spoke with a female sales agent and with McCarns as part of entering into the program[6], and also when she received a check for $108,000 after she signed documents.  ECF No. 555 at 116, 118-21.

           The government presented two additional homeowner witnesses, Jerome Pearlman and Alfred Limas, who testified concerning their involvement with Funding Foreclosures (Pearlman) and Nations Property Management/Creative Loans (Limas).  Neither testified they had worked with McCarns.

           With the exception of Pearlman, all the witnesses described a similar scheme.

           a.   <u>Sharolynn Cardenas</u>

           Cardenas testified as follows.  She was referred to McCarns for help after she and her husband filed for bankruptcy.  ECF No. 548 at 77-78.  In their second conversation, McCarns told her she would receive a packet in the mail with papers to fill out and that when she received the packet she and her husband should tell their lawyer to cancel the bankruptcy action they had

---

[6] It appears these conversations were over the telephone.  *See, e.g.,* ECF No. 556 at 31-34.

filed. *Id*. at 79.  He represented that the program would help them "make good on [their] credit"

and, "within a year . . . be able to help [them] get [their] home back." *Id*.  Specifically, McCarns

told her the equity in their home, $200,000, would be put in an escrow account and that after they

paid the mortgage for a year the equity would be returned to them "to use to buy back [their]

home." *Id*. at 80.  Cardenas checked with their mortgage broker who had referred her to McCarns

to see if the program was "legit" and the broker told her to "go ahead." *Id*.  When she and her

husband went to the title company to sign the papers, they learned they would be selling their

home. *Id*. at 81.  They declined to sign the papers and instead went to the mortgage broker's

office. *Id*.  He reassured them they would get their house back. *Id*. at 81-82.  Approximately

forty-five minutes later, McCarns called Cardenas. *Id*.  He was angry she and her husband had

not signed the papers, and he told her that "after two to three months [their] name would be back

on the deed for the home." *Id*.  Ultimately, they signed the documents. *Id*. at 83.  About a week

later they received documents that said they were renting their home for $1500 per month, with

no pets. *Id*. at 83-84.  A quick deed was included in the packet. *Id*. at 84.  Cardenas called

McCarns again, who told her she would remain in the house, no one would take it away from her,

and within a year she would get her money back and she could buy back her house. *Id*.  He

reiterated that the equity in her house, which she testified was supposed to be $200,000, would be

held in escrow for a year. *Id*. at 85.  As part of the arrangement, she received a check for $20,000

to help pay bills and re-establish the family credit. *Id*.  She never received the $200,000 back. *Id*.

After signing the documents, she made rent payments to Funding Foreclosures, but stopped when

the roof on her home caved in; she could not get insurance proceeds to fix the roof so had to close

her in-home business. *Id*. at 86-89.  At the time of trial she was still living in the home. *Id*. at 90.

### b.  Sheila Jones

Jones testified that while she was going through a foreclosure, she "received a

little flyer in the mail that said Funding for Foreclosures." ECF No. 551 at 166.  She called the

number on the flyer and spoke with McCarns. *Id*.  He told her she could not refinance the home,

"but that he had an angel investor that could help [her] out." *Id*.  The "angel investor" would

invest in her home, which would be put in trust, and she could make payments for a year, after

1  which the house would be returned to her and she would split the equity with the investor. *Id.* at

2  166-67.  The buy-back price she agreed to with McCarns was $195,000. *Id.* at 180.  McCarns

3  also told her she would have to make payments of $1,100 per month for a year, and that she

4  would receive $5,000 to pay her son's tuition. *Id.* at 167-68.  During the signing, she noticed

5  instructions not to transfer any funds to the seller. *Id.* at 169.  She sought and received

6  reassurance from the notary that her home would be put in trust. *Id.*  After the signing, she spoke

7  with McCarns who also reassured her the home would be put in trust. *Id.*  He also told her she

8  had time to rescind, which she did not do. *Id.* at 170.  Three days after the rescission period

9  ended she received a check for $5,000. *Id.* at 170-71.  She made her payments as required and

10  believed her home was in trust, "until the FBI showed up." *Id.* at 171.  In fact, the initial set of

11  papers signed by Jones resulted in the transfer of her home to Daniel Castillo, *id.* at 209, and the

12  property was not held in trust.  Ultimately, Jones lost the home to foreclosure. *Id.* at 180.

13                                              c.  Debra Kovacs

14            Debra Kovacs made contact with Domonic McCarns in 2005 while she was trying

15  to refinance her home.  ECF No. 553 at 194-95.  He called her at her home after she had been

16  filling out refinance forms online. *Id.* at 195.  Kovacs told him she had been told refinancing was

17  not possible, but he assured her he could refinance the home. *Id.* at 196.  After that, he called her

18  to send her to a title company to sign papers, but she "never made it there." *Id.*  He called her

19  again and told her it would be easier to send someone to her house. *Id.* at 197.  Based on the

20  conversations she had with McCarns, she thought she would be refinancing the house and

21  someone would be going on the title with her for one year. *Id.* at 198.  At the end of a year, she

22  would call McCarns, they would refinance the house, and the other person would be taken off the

23  title, leaving her as the only person on the title. *Id.*  She understood she would be making

24  monthly payments. *Id.* at 199.  She believed she had discussed the equity in the home with

25  McCarns, and that the equity would stay in the home. *Id.* at 200.  She received $1,000.00 as part

26  of the transaction. *Id.* at 201.  In fact, she signed a grant deed to her home, and ended up losing

27  the home. *Id.* at 203-04.

28  /////

1

#### d. Bertha Woods

2         Bertha Woods fell behind on her mortgage payments and became concerned about

3 foreclosure.  ECF No. 554 at 92-93.  She was referred to a company she remembered as

4 "foreclosure.com," and spoke to McCarns.  *Id*. at 93-94.  He told her they could help with the

5 house and she could rebuild her credit if she made payments.  *Id*. at 94-95.  He told her it would

6 cost her "a little more to get the house back."  *Id*. at 95.  She understood she would be making

7 payments of $500 a month to "some kind of management."  *Id*. at 96.  She decided to enter into

8 the program, and a notary came to her home with papers to sign.  *Id*.  She noticed different names

9 on the papers she was signing, and she called McCarns.  *Id*.  He told her the names were those of

10 people in the firm "and this is the way they do it."  *Id*.  She had understood that the house would

11 still be hers.  *Id*. at 97.  But when the papers came, she saw they were going to put it in a trust

12 under someone else's name.  *Id*.  He assured her that the name was of a person in the company

13 and "everything would be okay."  *Id*.  When she signed the papers, she still thought she would be

14 the owner of the home.  *Id*.  She also understood that if she did not keep up the payments, breach

15 the contract, or lose the home she would get part of the equity and the company would get part of

16 the equity from the home.  *Id*. at 98-99.  About a month later, she received notice that her

17 mortgage had been paid in full.  *Id*. at 99.  She also got a letter from an attorney for Kenny and

18 Marjorie Sly saying that the house was foreclosed on and she had to move out of the house.  *Id*. at

19 100.  Woods called McCarns' number but did not get through because the number had been

20 "changed or disconnected."  *Id*. at 100-01.  Woods ended up talking to someone who told her the

21 house was still hers and she needed to call numbers for the FBI and the IRS.  *Id*. at 101.  The

22 house went through foreclosure and a sheriff's sale, but no one bought it so she had a chance to

23 get it back.  *Id*.  She was still in the house at the time of trial.  *Id*.

24

#### e. Denise Ahearn (Nowlin)

25         Denise Ahearn, previously known as Denise Nowlin, testified that she contacted

26 Domonic McCarns after her mortgage broker had done "everything he could to help [her] keep

27 up."  *Id*. at 174.  It appears she consulted the mortgage broker after receiving a notice of

28 foreclosure from the bank.  *See id*. at 184-86.  The mortgage broker referred her to McCarns, who

1    had reached out to the mortgage broker.  *Id*. at 174.  Ahearn spoke with McCarns "many times."

2    *Id*. at 175.  He told her he could help her save her house "by having a trustee or investors" buy it.

3    *Id*.  She specifically asked that her name be left on the deed because she "didn't want [her] house

4    to get taken from underneath [her]" and he assured her "that wouldn't happen."  *Id*.  He told her

5    that after the trustee was put on the deed she would pay rent for a year and then be able to buy the

6    house back for less than she put into it.  *Id*.  She was under the impression that she would still

7    own part of the house during this period.  *Id*. at 175-76.  She was not willing to sign unless

8    McCarns guaranteed that he could not sell the house, or she wanted her name on the deed to give

9    her that protection.  *Id*. at 176.  McCarns told Ahearn to file for bankruptcy so that he could "get

10   the investors that he needed", which she did.  *Id*.

11          On cross-examination, Ahearn testified she understood that the bankruptcy filing

12   would stop the foreclosure. *Id.* at 203.  McCarns told her that once he got the investors, he would

13   call and tell her to cancel the bankruptcy.  *Id*. at 176.  McCarns eventually called and told her to

14   cancel the bankruptcy, which she did.  *Id*. at 177.  McCarns set up a meeting with a broker for her

15   at a McDonald's to sign the paperwork.  *Id*.  She signed the papers without reading them, and

16   then asked for a copy of the documents.  *Id*. at 177-78.  The broker promised to send copies but

17   never did.  *Id*. at 178.  McCarns also told her she would get a copy of the documents, but she

18   never did.  *Id*.

19          After that, McCarns stopped responding to Ahearn's calls, even though she was

20   trying to reach him to find out where to send her $2,000 rental payment.  *Id*. at 179.[7]  Ahearn

21   finally got an email from a woman with instructions where to send the payment.  *Id*.  She sent one

22   payment and then fell behind again.  *Id*.  She started getting mail for someone named Armil

23   Rucker, and after consulting an attorney she went to the registrar of deeds and found out that

24   Armil Rucker was the only name on the deed to her house.  *Id*. at 180.  When asked by the

25   prosecutor if she had ever received a specific amount of equity from her home -- almost $72,000

26

27          [7] On cross-examination, Ahearn testified that the monthly rental payment was $1,900 and
     she had paid "a little more."  *Id*. at 197.

28

16

--, or whether she had "knowingly give[n] permission to anyone else" to take that amount of equity out of it, she responded she had not. *Id*. at 182. Ahearn learned that what McCarns had told her about keeping her name on the deed and keeping her home was not true when she got a notice from the FBI that she "had been a victim of a crime." ECF No. 555 at 34.

### f.  Kelly DiSanto

Kelly DiSanto testified that she called a company called Creative Loans after she and her husband ran into financial difficulties. ECF No. 559 at 104-05. She spoke with McCarns, who told her he would help save the house. *Id*. at 105. Again, McCarns told her the company would take joint title on the house for a year, during which DiSanto and her husband would pay rent less than the amount of their mortgage. *Id*. At the end of the year, the company would come off title, and they would split the equity in the house. *Id*. at 105-06.

DiSanto and her husband had to file bankruptcy to avoid foreclosure because the process was taking "longer." *Id*. at 106. McCarns told her the company would reimburse the DiSantos for the bankruptcy, but it never did. *Id*. The DiSantos signed documents for the Creative Loans program in the presence of a notary sent to their house. *Id*. at 107.

A couple of months after they signed the documents they received their first rental bill. *Id*. at 108. DiSanto made timely payments, and at the end of the year contacted McCarns to find out what the next step was. *Id*. at 108-09. He told her she and her husband were ineligible because they had violated the contract by making some of their payments late. *Id*. at 109. Ultimately he told her they would have to buy the house back at a higher price because of the late payments. *Id*. The higher price was $670,000, which was not consistent with the original agreement. *Id*. at 109-10. They paid the higher price because they were just starting a family and had bought the house while it was still under construction and did not want to lose it. *Id*. at 110.

### g.  Deborah Brockway

Deborah Brockway, too, testified about being sold a program by someone she would make payments to for over a year, at the end of which time she could get her house back. ECF No. 555 at 116-17. She understood she would pay $25,000 and would receive $10,000. *Id*. at 117. She worked with a saleswoman named Beverly, but apparently was referred to McCarns

for "more explanations, more clarity" during the initial stages. *Id.* at 119.[8]  Once Brockway started writing checks to the company, someone who might have been McCarns contacted her to tell her the company had found a buyer for her home. *Id.* at 118-19.  She had started making payments right away, and the name of the company changed along the way from Nations Property, to Creative Loans. *Id.* at 120.  Brockway's house was then sold to someone named Michael. *Id.*  After the sale, she received a check for $108,000, which was the amount of equity in her house. *Id.*  She called and spoke with McCarns, who told her that the check was not hers and needed to go "directly to them." *Id.* at 121.  She told him she did not think that was right; she thought it was the proceeds from the sale of her home. *Id.*  McCarns was "very aggressive" and told her she would be in "big trouble" if she did not send "them" the check right away. *Id.*  So she then got a cashier's check in the full amount and sent it to McCarns. *Id.* at 122.

In November 2006, Brockway received a call from someone who identified himself as Michael Scallin and said he had bought her house. *Id.* at 122-23.   He told her he had bad news, that the FBI was investigating the company, and that it would be best if she did not send any more payments to him. *Id.*  He told her he was getting ready to go into bankruptcy. *Id.* She did not still live in the house at the time of trial. *Id.* at 125.

/////

/////

/////

/////

---

[8] Brockway's testimony in this regard was somewhat equivocal.  She testified that she initially spoke with a "Beverly Roshea" or "Rochelle" when she contacted Creative Loans. *Id.* at 116.  Beverly turned her over to someone she thought was the head of the company, who took her through the program. *Id.*  Whenever Brockway had questions, Beverly turned her over to this man. *Id.*  During direct examination, she testified that eventually someone called her and told her they had found a buyer for her home. *Id.* at 118.  The prosecutor asked whether "it was Beverly that told you or somebody else." *Id.* at 118-19.  She responded "I think it was, again, one of the head guys.  Yeah, it might have been Domonic who told me that." *Id.* at 119.  She also responded affirmatively to a question about whether she recalled "interacting with somebody named Domonic" and said her "recollection" of those interactions was that "[j]ust, again, it was explanations, more clarity coming from him.  And the other guy – was it Corcoran, I think?  It's all in my information." *Id.* at 119.

1

h.  Jerome Pearlman

2   As noted, the government also called homeowners Jerome Pearlman and Alfred

3   Lima.[9]  Pearlman testified that in early 2006 she owned a house with her wife.  *Id*. at 39.  They

4   had fallen about four months behind on the payments and were concerned about foreclosure.  *Id*.

5   at 39-40.  They received "an unsolicited phone call concerning help with mortgage arrears" and

6   "set up an appointment to have someone come out and talk" to them about it.  *Id*. at 40.

7   Approximately two weeks later someone came to the house and described a program.  *Id*. at 41.

8   Pearlman could not recall who the person was, and believed the group was named Funding

9   Foreclosures.  *Id*. at 42.  Ultimately the Pearlmans signed documents with Funding Foreclosures

10  as a party to the agreement.  *Id*. at 48.  Besides the Pearlmans, the printed names for the other two

11  signatures were Charles Head and Jack Corcoran.  *Id*. at 49.  Pearlman's understanding was that

12  by going into the program "Funding Foreclosures would be the intermediary between [the

13  Pearlmans] and the bank" and that after "approximately 18 months, they would assist us in being

14  able to procure a standard mortgage through one of the banks."  *Id*. at 51.  Pearlman understood

15  she and her wife would still be on title.  *Id*. at 52, 56-57.

16  The Pearlmans decided to join the program and signed documents when the notary

17  brought them to their house.  *Id*. at 53.  They received copies of the documents, as the notary said

18  they would.  *Id*.  Pearlman sent monthly payments in the amount of approximately $2,000.  *Id*. at

19  54.  Thereafter, her "next memory of the process" was of "receiving a letter from the FBI."  *Id*.

20  After that letter, they also got a letter from the bank that the house was going into foreclosure.  *Id*.

21  at 54-55.  That letter was also addressed to Kerry Budoff, who the Pearlmans had been told "was

22  the point person if we ever – if we had issues."  *Id*. at 55.  They tried to contact Budoff, but the

23  number they had was "actually a number to an elderly woman living in Encinitas, California."  *Id*.

24  at 55-56.

25

[9] At the time of the events underlying the charges against McCarns and his codefendants,

26  Pearlman was married to a woman named Denise L. Pearlman.  ECF No. 555 at 4, 39.  At the
    time of trial, Pearlman was known as Jerry and had changed gender identities.  *Id*. at 39.

27  Pearlman's legal name was still Jerome.  *Id*.  In this order, the court will use the feminine pronoun
    when referring to Pearlman.

28

1

i.   Alfred Limas

2           Limas testified that in 2006 he had fallen far enough behind on payments at his

3    home "for them to want to foreclose on it."  ECF No. 556 at 123-24.  A woman at the title

4    company that was going to foreclose on the property referred him to someone she thought could

5    help.  *Id.* at 124.  She referred him to Nations Property Management, and he called it after the

6    referral.  *Id.* at 129.  He told the person he reached that he was behind on payments and facing

7    foreclosure, and that he did not want to lose all his equity but wanted to try to use the equity to

8    save the house.  *Id.* at 125.  Subsequently, he signed documents.  *Id.* at 131.  Limas understood he

9    was selling his home to pay off the existing mortgage, would receive $5,000 in cash, and "after

10   12 months, split the equity and possibly re-buy [his] home back."  *Id.* at 131-32.  During those

11   twelve months, he would make payments to Nations Property Management.  *Id.* at 132.  He

12   received the $5,000, in the form of a check from Creative Loans, *id.* at 141, and he sent the

13   monthly payments by check.  *Id.* at 133.  At some point, three of the checks were returned to him.

14   *Id.* at 134-35.  He tried to call the phone number he had and "never got a response."  *Id.* at 135.  It

15   was around this time that he had contact with IRS Special Agent Fitzpatrick.  *Id.* at 135, 164.

16           2.       Defendant's Contentions Concerning Homeowner Witnesses

17           Defendant makes a number of contentions concerning alleged ineffectiveness of

18   his trial counsel in connection with cross-examination of the homeowner witnesses.  The

19   contentions fall into three general categories:  that counsel had information he could have used to

20   impeach the homeowners but did not; that counsel failed to conduct adequate investigation, which

21   would have uncovered the impeachment information; and that there were several times counsel

22   elicited information favorable to McCarns during cross-examination but then failed to use the

23   information during closing argument.  The contentions as to each witness are described in turn, to

24   the extent they apply, as follows.

25           a)       Sharolynn Cardenas

26           i.       Alleged Ineffectiveness

27           Defendant contends trial counsel was ineffective in not cross-examining Cardenas

28   about a civil lawsuit she had pending against McCarns, Funding Foreclosures and others.  He also

1      contends counsel failed to use a sworn declaration signed by Cardenas from the civil suit,

2      disclosed to him by the government, or her July 2013 statement to the FBI, which would have

3      revealed a number of contradictions between her trial testimony and the content of those

4      declarations.  He says her declaration would have shown that she received documents in June

5      2005, which "clearly articulated that she would be selling her home, be receiving $26,000 in

6      consideration for the equity in her home, and would be leasing her home for one year, at the end

7      of which, she could buy back her home at a designated price if she fulfilled all of her obligations

8      under the agreement."  ECF No. 712 at 49.  The declaration would also have shown that she

9      "physically met" with Peahu, her mortgage broker, and on his advice signed and mailed all the

10     documents back to Funding Foreclosures, and that it was Peahu, not McCarns, who told her to tell

11     her lawyer to dismiss the bankruptcy action.  *Id*. at 49-50.  The declaration would further have

12     shown that Cardenas was aware funds from the house would be sent to Creative Loans rather than

13     held in escrow.  *Id*. at 50.  The FBI statement would have shown that she never had a

14     conversation about removing equity from her home,[10] and that her insurance claim was denied

15     because the insurance company determined "'the leak was caused by the wear, tear, and

16     deterioration of the roof,'" not because of McCarns' failure to return her phone calls,  *Id*. at 50-

17     53.  Finally, defendant contends that counsel failed to highlight in closing argument that Cardenas

18     had closely read an addendum to the Equity Purchase Agreement "which would have diffused

19     Ms. Cardenas' allegations regarding the equity in her home."  *Id*. at 45.

20                              ii.      Counsel's Explanation

21                  At his deposition, trial counsel explained that Cardenas's testimony presented him

22     with a unique opportunity in comparison to the other homeowners in that she had the mortgage

23     broker, Peahu, and her lawyer look at the documents sent to her by McCarns, which fit with his

24     overall strategy to show that everything the homeowners agreed to was in the written documents

25     and that McCarns never pressured anyone, just sent them the documents to sign.  Greiner Dep. at

26

27              [10] Defendant also contends this statement could not be believed in light of the Equity
        Purchase Agreement she signed.  *Id*. at 51.

28

1  137-39.  Counsel also explained he did not recall seeing the declarations from the civil suit, and

2  that the trial strategy he chose showed the jury she had a mortgage broker and a lawyer to take the

3  documents to so she "was not relying in part on anything that was told to her over the phone." *Id.*

4  at 141. Counsel also testified that he "made the point" with Cardenas that she never met Domonic

5  McCarns, and had only talked to someone on the phone who "said the names Domonic and

6  McCarns" but could not verify the person she spoke with was the defendant. *Id.* at 138.  He

7  testified he did not use the letter from the insurance company to impeach Cardenas because

8  McCarns did not have anything to do with insurance proceeds and the charges against him did not

9  involve insurance proceeds.  *Id.* at 144.  Counsel testified he did not use the two bounced checks

10  to impeach Cardenas's testimony about why she stopped paying rent because (1) he did not have

11  an "independent recollection" of seeing the checks, and (2) his trial strategy was as described

12  above.  *Id.* at 145-47.  Finally, counsel testified he did not argue Cardenas's admission to having

13  read the addendum, because he had to make decisions about what to highlight during closing

14  argument, "tried to highlight the most important items," and could not pick everything that

15  happened in trial and repeat it in closing.  *Id.* at 149.

16  <center>iii.     Analysis</center>

17          Trial counsel's decisions regarding his cross-examination of Cardenas fall squarely

18  within the zone of deference afforded trial counsel under *Strickland* and its progeny.  To the

19  extent counsel may have been unaware of some available documents when he chose his trial

20  strategy, the record shows his trial strategy was the product of reasonable professional judgment

21  at the time he was representing McCarns.  *See Strickland*, 466 U.S. at 690-91; *see also*

22  *Harrington*, 562 U.S. at 107.

23          The right to effective assistance extends to closing arguments. *See
    Bell v. Cone*, 535 U.S. 685, 701-702, 122 S. Ct. 1843, 152 L.Ed.2d

24      914 (2002); *Herring v. New York*, 422 U.S. 853, 865, 95 S. Ct.
        2550, 45 L.Ed.2d 593 (1975). Nonetheless, counsel has wide

25      latitude in deciding how best to represent a client, and deference to
        counsel's tactical decisions in his closing presentation is particularly

26      important because of the broad range of legitimate defense strategy
        at that stage. Closing arguments should "sharpen and clarify the

27      issues for resolution by the trier of fact," *id.*, at 862, 95 S. Ct. 2550,
        but which issues to sharpen and how best to clarify them are

28      questions   with   many   reasonable   answers.   Indeed,   it   might

<center>22</center>

1

2

sometimes make sense to forgo closing argument altogether. *See Bell, supra,* at 701-702, 122 S. Ct. 1843. Judicial review of a defense attorney's summation is therefore highly deferential.

3 *Yarborough v. Gentry,* 540 U.S. 1, 5-6 (2003).  The record shows counsel did argue in closing

4 that every homeowner who testified admitted on cross-examination "they knew they were selling

5 their house to the company."  ECF No. 562 at 32.  He argued that they each testified on direct that

6 they "were going to have an opportunity to repurchase our house after 12 months paying rent"

7 and that common sense dictated that each knew they would not own the house if they were paying

8 rent and had to repurchase it; he also reviewed that on cross-examination he had taken them

9 through the documents to affirm what they had signed and that they "knew what was going on."

10 *Id*. at 32-33.  With a few exceptions, counsel argued about the homeowners as a group, s*ee, e.g.*,

11 *id*. at 32-34, 47-50, emphasizing that they all knew they were going to sell their homes and they

12 all "had time and opportunity all through the procedure to stop, pursue other options, talk to

13 attorneys, real estate, go to law enforcement."  *Id*. at 50.  Counsel's failure to highlight in his

14 closing argument that Cardenas had closely read an addendum to her Equity Purchase Agreement

15 was not outside the "'wide range' of reasonable professional assistance."  *Harrington*, 562 U.S. at

16 104 (quoting *Strickland*, 466 U.S. at 689).

17 <div align="center">b)      <u>Sheila Jones</u></div>

18 <div align="center">i.      Alleged Ineffectiveness</div>

19 Defendant contends trial counsel was ineffective in failing to impeach Ms. Jones'

20 initial affirmative response to the prosecutor's question on direct examination that she had gotten

21 involved with a company called Head Financial Services.  ECF No. 712 at 75.  Defendant

22 contends an IRS Claim for Remission form completed by Jones in 2010 would have shown that

23 she became involved with Funding Foreclosures.  *Id*.  Acknowledging that Jones corrected her

24 testimony and told the prosecutor that she had been involved with Funding Foreclosures, *id*. at 76,

25 defendant argues that the government nonetheless continued to refer to the company as Head

26 Financial Services, and this could have allowed the jury to infer that McCarns was using the

27 script contained in Exhibit 68, the foreclosure sales pitch document from Head Financial Services

28 found in Charles Head's home.  *Id*.  Defendant argues that "[d]ue to a lack of consultation with

<div align="center">23</div>

1    Mr. McCarns and a subsequent lack of appropriate investigation, [counsel] did not understand the

2    facts of the case sufficiently to trigger an alert for needed objections." *Id.*

3            Defendant also contends counsel did not, during closing argument, use testimony

4    elicited from Jones that showed she knew she was selling her property to Funding Foreclosures;

5    nor did he, during closing, correct inferences from her testimony that Jones' house had been

6    foreclosed on because of the Equity Purchase Agreement, rather than as a result of the FBI

7    investigation. *Id.* at 77-78. He argues there was evidence available to show Jones knew her new

8    payment was reduced by $34 even though she testified her new payment would be $300 more

9    than her mortgage payment, that Jones knew she was paying rent even though some of her

10   testimony could have led the jury to believe she thought she was refinancing to a new mortgage,

11   and that a complete set of escrow documents, beyond just the Equity Purchase Agreement, was

12   available to counsel to use during impeachment. *Id.* at 77-78.

13                          ii.      Counsel's Efforts

14           In addition to the arguments counsel made about the homeowners as a group

15   discussed above, he did specifically reference Jones during his closing argument, *see* ECF No.

16   562 at 34, 49, 50-51, and he specifically argued that Jones "couldn't stand me at all. She didn't

17   like any of my questions. She didn't like any of the answers that were truthful what she had to

18   tell you, the ladies and gentlemen of the jury." *Id.* at 50-51.

19                          iii.     Analysis

20           As discussed in Section II(B)(2), *supra*, counsel was not ineffective in his trial

21   strategy with respect to Exhibit 68, which was focused on establishing that there was no

22   connection between McCarns and that exhibit. Defendant's suggestion that the use of the

23   company name Head Financial Services could have allowed the jury to infer McCarns was using

24   the script contained in Exhibit 68 is speculative and does not support his claim for ineffective

25   assistance of counsel.

26           As noted, the standard for review of counsel's closing argument is "highly

27   deferential." *Yarborough*, 540 U.S. at 6. Counsel here was not ineffective in the way he chose to

28

24

argue about the testimony he elicited from Jones on cross-examination.  This contention is without merit.

<div style="text-align:center">c)  <u>Debra Kovacs</u></div>

Defendant contends trial counsel was ineffective in failing to use in his closing argument testimony he elicited from Kovacs on cross-examination, that she knew she was selling her house, and that she knew she had a right to cancel the transaction but did not.  ECF No. 712 at 78-82.  He also contends counsel failed to argue that McCarns' entire commission for the Kovacs transaction was $692.27.  *Id.* at 82.  For the reasons discussed in the preceding two sections, these omissions do not support a finding that counsel's representation of McCarns was ineffective.

<div style="text-align:center">d)  <u>Bertha Woods</u></div>

<div style="text-align:center">i.  Alleged Ineffectiveness</div>

Defendant contends trial counsel was ineffective in failing to impeach Woods with evidence that her home was already in foreclosure when she contacted Funding Foreclosure.  ECF No. 712 at 82.  He also contends that the discovery contained a statement given by Woods to the FBI that showed she knew she would be off title for a year, and that there were other "particulars" counsel failed to use to demonstrate Woods knew she was selling her property.  *Id*. at 83-85.  Defendant contends counsel failed to show Woods had over three months to review the documents before signing them, or to cross-examine her to show that her belief she would get part of her equity back was unfounded.  He also contends counsel failed to argue several of these points in his closing argument.  *Id*. at 82.

<div style="text-align:center">ii.  Counsel's Efforts</div>

Counsel took Woods through an extensive cross-examination focused on demonstrating what she knew and why that knowledge should not have led to the belief she was remaining on title.  ECF No. 554 at 135-36.  He cross-examined her with documents that said she was leasing the property and would have to perform every term of the lease agreement to buy her house back.  *Id*. at 138.  He also cross-examined her with documents that showed she was the seller of the property and FundingForeclosures.com was the purchaser.  *Id*. at 132.  Counsel further got her to acknowledge that she had time to read the documents, review them, and ask

<div style="text-align:center">25</div>

1    questions about them before she signed them.  *Id*. at 160-61.  The cross-examination also made

2    clear there were almost three months between the time Woods signed the first set of documents

3    and the time she signed the second set.  *Id*. at 160-62.

iii.    Analysis

5         The arguments raised by defendant concerning this witness do not demonstrate

6    that trial counsel was ineffective in representing McCarns.  Counsel covered the topics now

7    highlighted by defendant.  While defendant may believe there is something more, or different,

8    counsel could have done with Woods, he has not demonstrated that the representation was

9    ineffective when it came to cross-examining or impeaching her.  Moreover, for the reasons

10    already discussed, counsel's decisions about what to include in his closing argument about

11    individual homeowners versus the homeowners as a group are entitled to deference and did not

12    fall outside the scope of reasonable representation.

e)    Denise Ahearn (Nowlin)

i.    Alleged Ineffectiveness

15         Defendant contends trial counsel failed to argue that the Equity Purchase

16    Agreement Nowlin signed provided that her house could not be sold as long as she complied with

17    the terms of the agreement and instead lumped her in with all the other homeowners, that he

18    failed to argue Nowlin had acknowledged she knew she was selling her house and point to other

19    testimony from Nowlin that would have shown she knew she was selling her house, and failed to

20    argue that her cancelling of her bankruptcy petition was necessary so that she could join the

21    program.  ECF No. 712 at 87-89.  He also contends counsel failed to impeach Nowlin's testimony

22    that she never received copies of the signed escrow documents because he did not subpoena

23    signed escrow documents.[11]  *Id*. at 87.  And he contends counsel was not sufficiently familiar

---

[11] Defendant also contends counsel failed to impeach Nowlin with the fact that, while she testified at trial she met the notary at McDonald's, she told the FBI she met the notary at Denny's. Defendant does acknowledge this is a "minor point."  ECF No. 712 at 88.

1   with the facts to know that only $34,000 in equity was left in Nowlin's home, not almost $72,000,

2   as suggested by the government on direct examination.  *Id*. at 89-90.

3                              ii.      Counsel's Efforts

4          On cross-examination, counsel elicited testimony from Nowlin that she had been

5   referred to McCarns by her realtor after the realtor's attempts at everything he could do to save

6   her house had failed.  ECF No. 554 at 183-88.  Counsel also cross-examined Nowlin exhaustively

7   about the documents she signed in an attempt to demonstrate she knew she was selling her house.

8   *Id*. at 190-97.

9                              iii.     Analysis

10         Counsel's cross-examination of Nowlin and his decisions regarding cross-

11  examination fall "well within the wide range of professional assistance demanded of criminal

12  attorneys."  *Mancuso v. Olivarez*, 292 F.3d 939, 955 (9th Cir. 2002).

13                           f)      <u>Kelly DiSanto</u>

14                              i.      Alleged Ineffectiveness

15         Defendant contends trial counsel failed to effectively cross-examine DiSanto and

16  argues that "careful cross-examination would have raised more than a reasonable doubt as to

17  whether Ms. DiSanto was aware that she was going to be taken off title and aware she would lose

18  the equity in her home if she did not fulfill her obligations under the agreement."  ECF No. 712 at

19  54-55.  Defendant suggests, for example, that DiSanto's trial testimony that she did not read the

20  documents she was given could have been called into question.  He points to DiSanto's testimony

21  that the notary was at her home for an hour for the initial signing on April 29, 2005, which

22  involved sixteen pages, and contends that "[c]learly, the reason why the notarization of four

23  documents took an entire hour was because the 16 pages were carefully reviewed by Ms.

24  DiSantos [sic]."  *Id*. at 55.  Defendant also contends that counsel could have impeached DiSanto

25  with the fact that she had thirty days between the signing of the Equity Purchase Agreement and

26  the execution of title transfer and escrow related agreements to cancel the process.  *Id*. at 56.  He

27  contends DiSanto's testimony that she never received copies of the documents she signed was

28  "belied" by Agent Fitzpatrick's memo that on August 5, 2013, DiSanto had located the "program

1  documents" and would mail them to Fitzpatrick. *Id*. Defendant also contends there was evidence

2  that would have impeached DiSanto's testimony that McCarns told her she could not repurchase

3  the house and showed she was dealing with someone else instead and was not certain she had

4  spoken with McCarns about buying the house back. *Id*. at 57. Defendant contends DiSanto's

5  testimony that she had to pay a higher price to get her property back was false, and that

6  documents show she bought the property back for $612,750, the exact amount agreed to in the

7  Equity Purchase Agreement. *Id*. Defendant further contends counsel failed to use discovery that

8  showed DiSanto's home was foreclosed on in March 2010, years after she completed the Funding

9  Foreclosures program and bought her house back. *Id*. at 58. He suggests that once DiSanto was

10  told that "Funding Foreclosures may have been a fraud, she had an opportunity to recover her

11  losses in restitution." *Id*. at 58. Finally, defendant contends "a post-verdict subpoena" returned

12  documents that would have put a reasonable person on notice that DiSanto was going to be taken

13  off title. *Id*.

ii.      Counsel's Explanation

15  At his deposition, trial counsel testified he had no recollection of DiSanto. *See,*

16  *e.g.,* Greiner Dep. at 250-51, 253.  He did have a recollection of her testimony that a notary had

17  been at her house for about an hour. *Id*. at 253-54. Later he testified that "if Ms. DiSanto is the

18  one that actually bought the property back, I think my focus was to the jury that this was a

19  property that was not lost, that there were no misrepresentations at all." *Id*. at 257; *see also id*. at

20  258-60, 261.

iii.      Analysis

22  Viewed in the context of the entire trial, counsel's decision to focus his efforts

23  with DiSanto in this manner was not outside the bounds of competent professional assistance.

24  Defendant's contentions do not support a finding of ineffective assistance of counsel.

g)      Deborah Brockway

i.      Alleged Ineffectiveness

27  Defendant contends trial counsel failed to confront Deborah Brockway with

28  evidence received in a post-verdict subpoena that Brockway had emailed the title company and

directed them to send the $108,000 check directly to her.  *Id.* at 64-65.  Defendant contends

counsel should have subpoenaed this document, which would have showed Brockway knowingly

violated her agreement with Creative Loans.  He also contends trial counsel failed to impeach

Brockway with evidence that in order to get the $108,000 back, she "essentially made Creative

Loans/Funding Foreclosures reduce her buy back price" by $2,000 and her monthly payment by

$50.  *Id.* at 66.

<div align="center">

ii.      Counsel's Explanation

</div>

At his deposition, trial counsel testified that his strategy with Brockway was to

show once she got a call to return the $108,000 check, she never contacted law enforcement or

anyone to let them know someone was trying to steal her money, and never mentioned it to the

person she spoke with at the Portland Airport.  Greiner Dep. at 214.  He also testified she did not

appear to be a credible witness and he was waiting for cross-examination to demonstrate that to

the jury. *Id*. at 215.  He reiterated several times that his strategy with her was to focus on the

check.

<div align="center">

iii.      Analysis

</div>

Although counsel's strategy with respect to this witness is not entirely clear to the

court, the court finds no prejudice to McCarns from the omissions complained of.  There is no

reasonable probability the outcome of McCarns' trial would have been different had counsel

taken a different approach to this witness.

<div align="center">

h)      Jerome Pearlman

i.      Alleged Ineffectiveness

</div>

Defendant contends trial counsel failed to use "an arsenal of facts" that would have

shown Pearlman was testifying about an entirely different program from the Funding

Foreclosures program, and that the sales agent Pearlman testified about could not have been

McCarns.  ECF No. 712 at 41-43.  He also contends counsel failed to interview the notary who

handled the document signing with the Pearlmans.  Defendant offers a post-verdict interview with

the notary to support the contention that her testimony would have showed Pearlman knew he

was selling her home and would be off title.  Ex. Q to Motion for New Trial, ECF No. 712-18.

1    And he contends counsel failed to use a second set of documents signed by Pearlman, which also

2    would have showed she knew she was selling her house.  ECF No. 712 at 46.  Finally, counsel

3    argues that counsel failed to "carefully articulate" in his closing argument that Pearlman's house

4    was only foreclosed on after the FBI shut down Funding Foreclosures, that Pearlman was in fact

5    in grave danger of foreclosure when she signed on to the Funding Foreclosures program, and that

6    even though she signed a complete set of documents saying she was selling her house, "once the

7    FBI informed [her] [she] was a 'victim of fraud' [citation omitted], [she] jumped on the victim-

8    bandwagon and claimed [she] knew nothing about the terms of the contract."  *Id*. at 46-47.

9                              ii.      Counsel's Explanation

10          At his deposition, trail counsel testified he did not know if he had "an independent

11   recollection of Pearlman."  Greiner Dep. at 110.  Counsel's deposition testimony gives very little

12   insight into whether he understood the differences between the two programs the Pearlmans

13   became involved in.  He testified that "the Pearlmans were used in [his] trial strategy as people

14   that did not lose their house, that they were one of the few that went through the program and – if

15   I have these people correct.  I think that's it."  *Id*. at 131-32.  He also testified that he took

16   Pearlman through documents to show that everything was in writing and McCarns had not made

17   any misrepresentations.  *Id*. at 132-33.  He also testified that he did not interview the notary

18   because, going back to his "theory of the case," everything was in writing and the documents

19   showed McCarns had not made any misrepresentations.  *Id*. at 135.

20                             iii.     Analysis

21          After review of the record, the court finds defendant has not carried his burden to

22   show he suffered cognizable prejudice as a result of the omissions asserted.  Even if counsel did

23   not understand that Pearlman was confusing two distinct programs and therefore was not prepared

24   to cross-examine Pearlman in a manner that would have demonstrated that she was confused, this

25   is not enough to warrant relief on this motion.  On this record, there is no basis for finding the

26   outcome of McCarns' trial would have been different had counsel prepared more thoroughly for

27   Pearlman's testimony.

28

i)      Alfred Limas

i.      Alleged Ineffectiveness

Defendant contends that Limas's testimony generally was exculpatory for the defense, but that trial counsel failed to adequately cross-examine Limas concerning the circumstances surrounding the foreclosure of his home and the Addendum to the Equity Purchase Agreement he signed, which gave Limas the option of buying his home back at below-market value "with unliquidated equity left in the home." ECF No. 712 at 61-62.

ii.      Opposition/Counsel's Explanation

In opposition to the motion, the government observes, correctly, that in closing argument the prosecutor told the jury that the testimony and evidence concerning Limas was related to Counts 3 and 4 of the indictment, which were charged against Charles Head only. *See* ECF No. 561 at 138, 178-79. Head's lawyer, Scott Tedmon, also argued to the jury that Counts 3 and 4, which were brought against Head only, involved Limas. *Id*. at 217-18.[12] On cross-examination of Limas, counsel elicited testimony that Limas did not know Domonic McCarns, and that he had no idea whether he had spoken with McCarns or not. ECF No. 556 at 165-66.

iii.      Analysis

Given the foregoing, McCarns suffered no cognizable prejudice from any alleged omissions by counsel during his cross-examination of Limas.

j)      Conclusion

In sum, the record shows that McCarns' trial counsel adopted a reasonable two-part trial strategy and followed it with the homeowner witnesses, often exhaustively taking a witness through several documents he or she had signed in order to highlight the differences between what was written in the signed documents and the witness's testimony at trial about what McCarns had represented over the telephone. Counsel's deposition testimony signals he made a conscious, strategic decision to avoid taking an unduly harsh approach with witnesses who, despite some memory lapses and imperfect recollections, had the potential to be sympathetic

---

[12] Tedmon argued Limas never testified to any contact with Head. *Id*. at 218.

players on the trial stage.  While there may have been aspects of the handling of homeowner witnesses that could have been more nuanced or in some cases focused differently, this does not demonstrate that counsel's representation of McCarns was ineffective with respect to the homeowner witnesses.

### 3. Company Witnesses

Two of the government witnesses, Kou Yang and Keith Brotemarkle, had worked for Head Financial Services and Creative Loans.  ECF No. 549 at 67, 104 (Yang); ECF No. 557 at 36-38 (Brotemarkle).  Both testified subject to cooperation agreements entered into as part of their guilty pleas in this case.  ECF No. 550 at 96-97 (Yang); ECF No. 557 at 43-44 (Brotemarkle).

### a) Kou Yang

#### i. Direct Examination

As relevant to this motion, Kou Yang gave the following testimony on direct examination.  She started working for Charles Head in the mortgage industry in 2001, and she worked for him until late 2005 or early 2006, at which point she transferred to work for Benjamin Budoff.  ECF No. 549 at 67.  At the beginning she was a loan processor, completing loan applications after all the required documents came in and then waiting for the loans to be approved or denied.  *Id*. at 69-70.  She also processed approvals when they came through.  *Id*. at 71.  After "about two years in," Head had a meeting with all the loan officers and told everyone they would be "getting away from doing refinancing" and shifting toward loans involving foreclosures and "making more money."  *Id*. at 72.

When she first started working, Yang worked in Long Beach at an office on Atlantic.  *Id*.  The office subsequently moved to Costa Mesa.  *Id*. at 73.   Yang was not clear when the office moved to Costa Mesa, testifying as follows:

> Q. Do you recall, to the best of your recollection, when that move happened?

/////

1            A.  That move happened in 2006 or late 2005. Early -- earlier than

2                that. It's got to be. Probably 2005 or -4.

3                Because I know we were there for at least two to three years.

*Id*. at 73.  After Costa Mesa, she worked at an office in Tustin, moving there "probably" in the spring of 2006.  *Id*.  She described the layout of the Costa Mesa office as having a department of loan officers and a department of processors.  *Id*. at 74.  All the loan officers were in the same office, and Head had an office there.  *Id*.  In Long Beach everyone was in one big room with "desks all over the room."  *Id*.  In Costa Mesa, "everybody pretty much had their own office except for a few rooms" where there were "like two or three loan officers."  *Id*.

        "[A]t the beginning" in Costa Mesa, Yang worked with "Mike Head, Domonic McCarns, Elizabeth Huerta, Keith Brotemarkle" and a Brian whose last name she did not remember, as well as a few more whose names she could not remember.  *Id*. at 75.  She testified that Mike Head left while they were at Costa Mesa and Andrew Vu was there at the beginning and then left, and then once Keith Brotemarkle "came on board, he hired more sales people."  *Id*.

        Yang saw sales people doing their jobs.  *Id*. at 78-79.  She testified that "salespeople were, in a sense, they were loan officers because the loan officers actually made the sales, so they are one and the same."  *Id*. at 79.  She observed McCarns, in the Costa Mesa office, "take the leads that would come over the internet, and . . . call the homeowners, and . . . pitch a sale to them."  *Id*. at 80.  She heard him call homeowners, ask them if they had inquired about saving their home, tell them he had a program they might qualify for, and then go "into his pitch."  *Id*. at 80-81.  She testified to the pitch, as follows:

           A. Okay. The loan officer, Domonic McCarns, I have

              heard him say: We will take the loan, and we'll have an

              investor purchase the property in their name. You remain in

              the property for a duration of a year until your credit is

              fixed. And then during that time, you pay rent to us. And

              then after a year, you can purchase the property back.

*Id*. at 81.  There was a white board to track the loans in process, and a filing system.  *Id*. at 82.
The company had a mortgage loan application that had to be completed for every loan in the
program.  *Id*. at 86-90.  The loan officers entered the information into the form, then emailed the
processors and told them the file was ready.  *Id*. at 90.  In addition, the loan officers printed the
form and turned it in to the processors with another form asking them to open escrow and order
an appraisal.  *Id*.  Yang's boss in Costa Mesa was Charles Head.  *Id*.

Yang was arrested and charged as a co-defendant for what she did at Head
Financial Services.  *Id*. at 104.  She pleaded guilty, and testified as part of an agreement with the
government.  *Id*.  She had previously been arrested and convicted for grand theft.  *Id*. at 105.
Head knew about her prior conviction when he hired her.  *Id*.

Yang testified concerning an email she sent to Charles Head, with a copy to
McCarns, admitted as Government's Exhibit 201.  ECF No. 550 at 24.  She explained that "we"[13]
had two loans at a bank, one for a property in Tucson, Arizona, and one for a property in
Riverside, California.  *Id*. at 25.  The Riverside loan was at 100 percent because "we" could try to
prove to the bank that the buyer would live in the property, but "we" could not prove the Tucson
property would be owner-occupied.  *Id*. at 25-27.  In fact, the person identified as the owner on
the loans, Simone Vu, was not going to live in either of the properties.  *Id*. at 27-28.

Yang said that in April 2005, McCarns was a loan officer, and Keith Brotemarkle
"was the manager for the loan officers."  *Id*. at 30-31.  At that time, Head directed Yang to send
an email informing everyone he did not want to do any more loans where there was less than
$50,000 equity in the property, because "he didn't want anymore loans to come through that he
wasn't making enough money on."  *Id*. at 32-33.  This email was admitted as Government Exhibit
204, and was sent to McCarns, who was a loan officer, and several other people.  *Id*. at 29-30.
She testified concerning other emails to and from McCarns, including one in which he told
everyone that the client involved had gone to a notary office and signed all the documents selling

---

[13] Yang testified that "we" in this context meant "the company, Head Financial, Charles
Head, Domonic McCarns, me.  You know, we all processed this loan.  And they brought it to me.
I processed it.  So we were all involved."  *Id*. at 25.

the client's property, and to let him know in the future if there were "any issues with his loans . . . and he will handle it himself unless he tells us otherwise." *Id*. at 39.  She testified to another email stream, describing it as "Domonic McCarns telling Emily, who was the girl that would order all the payoffs, he's telling her, you know, look at how fast I got the payoff with the stuff – with his charm, I guess, he was able to get it," and she also testified concerning her response to this email, and McCarns' reply.  *Id*. at 42-43.

She testified concerning an email sent to McCarns informing him that one of the company's "straw buyers," Kerry Budoff, had too many loans and could not be identified as a buyer on any more loans.  *Id*. at 46-47.  She also testified that Nations Property Management was run by Charles Head and created as a company to manage the properties.  *Id*. at 51-52.

Yang testified that the company started using some forged signatures when it started doing foreclosures, and that the use of those only continued at the Costa Mesa office "for a little bit of time" and then stopped.  *Id*. at 66-69.  Yang also did false verifications of rent but only did those "[a]t the end of Long Beach" and only at the start of Costa Mesa until Brotemarkle was hired.  *Id*. at 69-70.  She said she and loan officers, including McCarns, did this for people who did not have a two year rental history.  *Id*. at 71-72.  She also said McCarns was involved in overstating income on loan applications.  *Id*. at 75-76.  McCarns was involved in transactions where false claims of owner occupancy were made.  *Id*. at 76-77.

ii.     Cross-Examination

On cross-examination, McCarns' trial counsel elicited the following testimony from Yang.  When she spoke to government agents in March 2013, April 2013, and two days before cross-examination, she never told them that McCarns forged any documents.  *Id*. at 137-38.  She was never asked, and she probably did not volunteer the information.  *Id*. at 138.  She also testified she was not shown any documents during direct examination that had been forged by McCarns.  *Id*. at 139.  She confirmed McCarns was not with Head Financial when the offices were in Long Beach.  *Id*. at 141.  She confirmed that the sales agents in Long Beach went out and met with people to sign the documents.  *Id*.  She testified that the pay was split 50-50 during the Long Beach operation, that the sales agents also had to find banks to make the loans, and that

1    there were not "lines of demarcation at Long Beach" and everyone was in a big office. *Id*. at 142.

2    She also testified that the sales agents set up LLCs in Long Beach. *Id*. at 144.

3       McCarns' trial counsel also elicited testimony that several of the sales agents did

4    not work at the Costa Mesa office, and that Mike Head worked there for a few months and then

5    went to Arizona. *Id*. at 144. Yang did not remember "exactly when" McCarns started working in

6    Costa Mesa but that it was "shortly after" they moved there, and that his initial work for Head

7    started when he was hired in Costa Mesa. *Id*. at 145. Counsel cross-examined Yang extensively

8    about differences between the role of sales agents in the 50-50 LLC operation that was in effect in

9    2004, and that of sales agents, including McCarns, in the Costa Mesa operation. *Id*. at 149-52.

10   He also cross-examined her about changes after Keith Brotemarkle came into the company. *Id*. at

11   153-54. He elicited testimony that "[a]t the beginning" McCarns' duties were the same as a

12   number of other sales agents, none of whom had anything to do with loan applications. *Id*. at

13   156-57. He also elicited testimony that McCarns was not involved in the marketing techniques,

14   had nothing to do with processing, no job duties to cut checks for the company or pay any bills,

15   and that she never saw McCarns' signature on any loan application. *Id*. at 157-58. She

16   confirmed that the loan officers' job was to make telephone sales of the product. *Id*. at 162.

17      Counsel cross-examined Yang extensively about several emails involving

18   McCarns in an effort to neutralize inferences the government tried to raise on direct examination.

19   *See id*. at 163-69. He took her through a long list of people who were in the company files and

20   elicited testimony that she could not tell the jury if she had ever heard McCarns talk to any of

21   those named. *Id*. at 178-81. He elicited testimony from Yang that while McCarns was called a

22   loan officer, he did not fill out loan applications. *Id*. at 183. He elicited testimony that Yang's

23   significant other had beaten up McCarns. *Id*. at 185-86. He elicited testimony that she never

24   "saw" McCarns talk to anyone getting a loan, and that if she "walked into his office" she would

25   "hear him talking to customers on the phone", but otherwise could not hear him because of the

26   location of her office. *Id*. at 187.

27   /////

28   /////

iii.    Analysis

Defendant challenges trial counsel's representation in his handling of Yang's testimony in four ways.  First, he contends counsel did not adequately confront Yang's testimony that McCarns had been working at the company "at the beginning" in Costa Mesa.  ECF No. 712 at 90.  McCarns contends this allowed the jury to believe McCarns was part of the supposed "open fraud" that had gone on at Long Beach during the 50-50 LLC period and phased out after the transfer to Costa Mesa.  At his deposition, counsel acknowledged he did not cross-examine Yang on this because it "just escaped" him and he was focused on what he considered more important issues.  Greiner Dep. at 183.  He also testified he did not believe this caused any prejudice or lead the jury to believe McCarns had been part of the 50-50 LLC period because during the direct examination of Justin Wiley the people who were sales agents had been identified and McCarns was not among them.  *Id*.  Viewing the record evidence as a whole, this omission did not constitute ineffective assistance of counsel, nor did it cause cognizable prejudice.

Defendant's second contention is that Yang's "testimony that sales agents were loan officers was . . . wrong" and that counsel was ineffective in failing to use evidence to show that only Head, Yang, and Brotemarkle were involved in structuring loans and dealing with financial institutions.  ECF No. 712 at 91-92.  Viewed as a whole, Yang's testimony was that sales agents also were referred to as loan officers in the Head companies while McCarns worked there, and counsel's cross-examination was sufficient to make clear to the jury the role of sales agents, including McCarns, and to demonstrate why the title "loan officer" might have been misleading.  This contention is without merit.

Defendant's third contention is that trial counsel was ineffective in failing to adequately challenge Yang's testimony around Government Exhibit 61, or to challenge the admission of three other similar exhibits, 62, 63, and 66 .  Defendant contends Exhibit 61 "was a document used in the timeline prior to when Mr. McCarns worked for Head and demonstrated that the 'sales agent/partner' and Charles Head paid the balance of the mortgage payments 50/50,'" and that counsel's "lack of preparation" made him unable to handle the document

37

1    effectively and show that it had no bearing on McCarns because sales agents employed while

2    McCarns worked at the company "were not responsible for paying one-half the mortgage."  ECF

3    No. 712 at 92.

4            Exhibit 61 is identified as a Foreclosure Schedule April 2005.  ECF No. 549 at 4.

5    Exhibit 62 is identified as a Foreclosure Schedule May 2005, and Exhibits 63 and 66 are undated

6    Foreclosure Schedules.  *Id.*  On cross-examination, counsel did elicit confirmation from Yang that

7    the 50-50 split was used in Long Beach in 2004 and that Exhibit 61 showed two figures, "one in

8    the 400s and one in the 200s," "because in 2004 the investor or the loan officer/sales agents,

9    having their limited liability corporations, had to pay half of whatever the mortgage was on the

10   property. . . ."  ECF No. 550 at 149-50.  At his deposition, counsel testified that he did not use

11   cross-examination of Kou Yang to affirmatively establish that sales agents like McCarns, working

12   in 2005-06, were not part of the 50-50 split because counsel thought Wiley's testimony clearly

13   established that.  Greiner Dep. at 202.  He also testified that McCarns' name was not on any of

14   the documents.  *Id.* at 204.  Counsel was not ineffective in his handling of this exhibit or the

15   related ones.

16           Defendant contends Yang's testimony was confusing about when sales agents

17   filled out loan applications and that she contradicted herself about false verification of rent forms.

18   He says evidence existed but was not used by counsel that showed McCarns could not have

19   falsified the forms because he started working at the company, according to Yang's testimony,

20   after the practice of false verification of rents had stopped.  ECF No. 712 at 93.  Viewed in the

21   context of the entire trial, these contentions do not support a finding that counsel was ineffective

22   in his representation of McCarns.

23           Finally, defendant argues trial counsel failed to include key concessions by Yang

24   in his closing argument.  As discussed above, in the context of an ineffective assistance of

25   counsel claim judicial review of closing argument is highly deferential.  Counsel's failure to

26   include the matters described in defendant's motion do not constitute ineffective assistance of

27   counsel.

28

1            b)      Keith Brotemarkle

2                    i.      Direct Examination

3            Keith Brotemarkle gave the following testimony on direct examination.  He went

4    to work for Head Financial Services in January 2005.  ECF No. 557 at 37.  He was hired by

5    Charles Head to be "[d]irector of marketing, marketing manager, and like a loan manager."  *Id*.

6    Initially, his job was to "bring in mortgage leads, . . ., sales leads, for loan officers."  *Id*.  He "ran

7    the mortgage office for several months, January, February" of 2005.  *Id*.  He testified that

8    "eventually his duties changed to go more toward Charles' other business at the time.  He was

9    running like a foreclosure type of business."  *Id*.  When his duties shifted to the foreclosure side

10   of the business, he solicited mortgage brokers to direct foreclosure applications to Head's

11   business.  *Id*. at 38.  The business was known as Head Financial Services and as Creative Loans.

12   *Id*. at 39.  Mortgage brokers were given an incentive of $4,000 for every application converted to

13   the program.  *Id*.

14           Brotemarkle knew McCarns, and that McCarns was working with Head "on a

15   foreclosure program."  *Id*. at 45.  McCarns was working directly with people in foreclosure, and

16   Brotemarkle said McCarns' title was "consultant, underwriter."  *Id*.  There were other people in

17   the same role as McCarns.  *Id*. at 45-46.  McCarns had previously worked as an account executive

18   in the mortgage industry.  *Id*. at 47.

19           Brotemarkle was concerned about McCarns.  *Id*. at 73.  He expressed his concerns

20   in an email that said, in part, "'Domonic needs his spiel to be revised; he has got one line of' –

21   expletive – 'running that is built to deceive and give him the result he is looking for, but he

22   worries me about possible issues down the road.'"  *Id*. at 73.  Brotemarkle did not know whether

23   McCarns stopped giving the "spiel" he was concerned about.  *Id*. at 74.  Brotemarkle testified

24   about other emails McCarns sent, including one that said "'I get as creative as necessary to close

25   the deal within company guidelines of course, which demands client respect,'" and another which

26   read, "'Emily, see how fast I get the payoffs with that line of crap I give them; it works like a

27   charm.'"  *Id*. at 75-76.  He also testified to an email McCarns wrote saying, "Heads up, no

28   extensions on this file.  Sales date is 10-23-06.  Come on team, let's make sure we close this file.

39

I don't want to lose another file and worse another broker." *Id*. at 80.  Brotemarkle understood

this to mean the property was to be auctioned on October 23, at which point "the application and

our program would be dead." *Id*.

Defendant contends trial counsel was inadequately prepared and therefore could

not effectively cross-examine Brotemarkle "to help the jury understand that Mr. McCarns was not

involved in the fraudulent portion of the business."  ECF No. 712 at 69.  He also contends that by

calling the foreclosure program "Creative Loans/Head Financial Services," the government was

attempting "to exploit" Exhibit 68, the foreclosure sales pitch found at Head's home, and tie it to

the program McCarns was working, and that counsel "endorsed" this by "repeatedly referring to

Creative Loans/Funding Foreclosures as Head Financial Services."  *Id*. at 70.  Defendant also

contends the "most glaring omission" by counsel was that he failed to place Exhibit 68 before

Brotemarkle and ask if he had ever seen it, because counsel had received in discovery

Brotemarkle's February 16, 2013 statement to IRS agents that he had never seen the script that is

contained in Exhibit 68.  *Id*. at 70-71.  Defendant makes a number of other arguments about

inadequate cross-examination of Brotemarkle, *see id*. at 71-73, and contends counsel missed

opportunities in closing argument to use a trial exhibit to show McCarns was not involved in the

loan processing side of the organization, and to show contradictions between Yang's testimony

and Brotemarkle's.

ii.     Trial Counsel's Efforts

Trial counsel testified at deposition concerning his strategy with respect to closing

argument and the necessity to highlight the most important points in closing.  Greiner Dep. at

231.  He explained his decision not to argue that Brotemarkle's testimony showed that Yang had

been untruthful when she said McCarns worked with loan applications by pointing out that there

were no documents that showed that.  *Id*. at 232.  He explained he had information that Yang had

been at least partially truthful in testifying that McCarns matched homeowners with investors

because McCarns tried to get his child's mother to be an investor.  *Id*. at 233.  He also testified he

did not use the FBI statements on cross-examination because there were other things about

Brotemarkle he "deemed . . . more important." *Id*. at 239-40.  In his view, "the way the evidence

1    was coming in, Mr. Brotemarkle and Ms. Yang were basically doing a company takeover from

2    Mr. Head and they did not like the fact that Mr. McCarns was always asking questions and

3    pushing for answers." *Id*. at 241.  He also testified that on cross-examination he showed the jury

4    that Brotemarkle could not describe the "spiel" by McCarns that Brotemarkle had professed to be

5    worried about in the email he testified to on direct examination.  *Id*. at 244.

6                   iii.      Analysis

7          Again, after review of the entire record, the court finds counsel's strategic

8    decisions about how to cross-examine Brotemarkle and how to incorporate his testimony into

9    closing argument are entitled to deference and within the bounds of competent professional

10    assistance.

11         D.       Compelled Immunity for Exculpatory Defense Witnesses

12            1.       Parties' Arguments

13          Defendant's final contention is that his trial counsel provided ineffective assistance

14    in failing to move to compel immunity for two exculpatory witnesses, Scott Wagner and Todd

15    Hickman, who signaled their intention to assert their Fifth Amendment right against self-

16    incrimination.  Defendant contends Wagner's "testimony would have directly contradicted

17    [Keith] Brotemarkle's testimony that he did not manage Mr. McCarns" and "Brotemarkle's

18    testimony that he did not train sales agents on the sales pitch."  ECF No. 712 at 101.  Defendant

19    also contends Wagner's testimony would have contradicted Kou Yang's testimony that

20    "'underwriters' handled the fraudulent loans" and would have demonstrated that sales

21    consultants, had nothing to do with loans.  ECF No. 712 at 102.  Defendant contends Hickman's

22    testimony would also have contradicted Brotemarkle's testimony because Hickman would have

23    testified that Brotemarkle was the office manager.  Hickman also would have testified that

24    "Brotemarkle did not want employees in the loan side of the business talking to others," thereby

25    "shed[ding] light on why Mr. Brotemarkle distanced himself from knowing the inner workings of

26    the office area."  ECF No. 712 at 103.

27          The government contends the absence of these witnesses' testimony did not "'so

28    distort. . . the factfinding process that the defendant was denied his due process right to a

fundamentally fair trial.'"   ECF No. 724 at 30 (quoting *United States v. Straub*, 538 F.3d 1147,

1162 (9th Cir. 2008)).   The government also contends that the decision not to call these two

witnesses was not ineffective.  With respect to Wagner, the government argues that the small

benefit that might have been gained by Wagner's testimony was outweighed by crucial

differences between Wagner and McCarns, including evidence that Wagner told at least one

client the truth about being removed from title, that McCarns was the leader of the sales

department, and that McCarns made far more money than Wagner.  With respect to Hickman, the

government argues that calling him would have opened up a line of cross-examination concerning

false rental agreements, one of which listed Hickman, and would have allowed the government to

show that all levels of the company were involved in the fraud.  Finally, the government contends

McCarns cannot show prejudice from the failure to seek immunity for these two witnesses.

                    2.      Legal Standards

            Due process requires a court to compel use immunity for a defense witness when

the prosecution has refused to grant such immunity and defendant shows

> (1) the witness's testimony would have been relevant, and (2) the
> prosecution refused to grant the witness use immunity with the
> *deliberate intention* of distorting the fact-finding process. . . .  To
> demonstrate the prosecutorial misconduct of the second prong, [the
> defendant must show that the prosecution *intentionally* caused a
> defense witness to invoke the Fifth Amendment right against self-
> incrimination, *or* that the prosecution granted immunity to a
> government witness in order to obtain that witness's testimony, but
> denied immunity to a defense witness whose testimony would have
> directly contradicted that of the government witness.

*Straub*, 538 F.3d at 1156 (quoting *Williams v. Woodford*, 384 F.3d 567, 600 (9th Cir. 2002))

(emphasis in *Straub*).

            The test for relevance, the first prong, is "'minimal.'"  *Straub,* 538 F.3d at 1163

(quoting *Williams*, 384 F.3d at 600).  A defendant is not required to "'show that the testimony

sought was either clearly exculpatory or essential to the defense.'"  *Straub*, 538 F.3d at 1163

(quoting *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991) (internal quotation

marks omitted)).  It is sufficient that the witness's testimony would, for example, have "raised

credibility questions about a key prosecution witness."  *Straub*, 538 F.3d at 1157.

1    The second prong may be satisfied either by a showing that the prosecution made

2    immunity decisions "with the purpose of distorting the fact-finding process" or that the

3    prosecution's immunity decisions "had the effect of distorting the fact-finding process." *Id.* The

4    latter showing requires a defendant to demonstrate that "the prosecution granted immunity to a

5    government witness in order to obtain that witness's testimony, but denied immunity to a defense

6    witness whose testimony would have directly contradicted that of the government witness, with

7    the effect of so distorting the fact-finding process that the defendant was denied his due process

8    right to a fundamentally fair trial." *Id.* at 1162. "'[T]he test requires only that the proffered

9    defense testimony directly contradict[s] the government witness's testimony on a relevant issue,

10   not that the testimony would have compelled the jury to exonerate the defendant.'" *United States*

11   *v. Wilkes*, 662 F.3d 524, 534 (9th Cir. 2011) (quoting *Straub*, 538 F.3d at 1163).

12            3.    Analysis

13            Defendant proffers the following statement by Wagner in support of this part of his

14   motion:

15            Wagner said it was a long time ago and he recalls working for the
              company for about 6 months.  He remembers Domonic McCarns
16            being there before he arrived.  As far as he knew, McCarns and he
              had the same jobs as Sales Consultants.  Account Executives
17            worked them [sic] and they would give the sales pitch as given to
              them by their manager, Keith Brotemarkle.  The program made
18            sense to him and he told clients what the company told him to say.
              He believes McCarns would have been doing the same.
19

20   ECF No. 712-23.  Relying on this, defendant contends Wagner's testimony would have "directly

21   contradicted" Brotemarkle's testimony that Brotemarkle did not manage McCarns, and that he did

22   not train agents on the sales pitch.  ECF No. 712 at 101-02.  McCarns argues that Brotemarkle

23   distanced himself from his management role and his involvement with the sales pitch "to justify

24   his ignorance of any specific misrepresentations made by Mr. McCarns," and that "Wagner's

25   testimony would have ended Mr. Brotemarkle's distortion of the facts."  ECF No. 712 at 102.

26   Similarly, defendant contends that Hickman told an IRS agent that Brotemarkle was

27            the office manager for Creative Loans/Head Financial
              Services/FCO, Inc.  Brotemarkle did not like employees talking
28            with other employees who were outside their respected [sic]

43

department and/or title.   This policy was really stressed with employees who worked in the processing department.   Hickman thought Brotemarkle did this for two reasons.   First, Charles Head, Kou Yang, and Brotemarkle were earning a lot of money from homeowners and they did not want employees to know.   Second, Charles Head, Kou Yang, and Brotemarkle might have been doing something illegal.

*Id.* at 103.  Defendant contends this would have contradicted Brotemarkle's testimony that he "did not manage the office area where McCarns worked" and would have "shed light on why Mr. Brotemarkle distanced himself from the inner workings of the office area."  *Id.*  Defendant contends generally that Hickman's testimony "would have prevented the distorted view that Brotemarkle's testimony had created for the jury.

To review, Brotemarkle gave the following testimony relevant to these contentions.  He testified that he knew McCarns because they worked in the same office.  ECF No. 557 at 45.  When Brotemarkle first became involved with the foreclosure program, McCarns was working in that program "with persons in foreclosures directly."  *Id*.  McCarns' job title was "consultant, underwriter."  *Id*.  In May 2005, Brotemarkle became concerned about the message McCarns was delivering to homeowners.  *Id*. at 72-73.  He sent an email to Head stating "'Domonic needs his spiel to be revised; he has got one line of' – expletive – 'running that is built to deceive and give him the result he is looking for, but he worries me about possible issues down the road.'"  *Id*. at 73.  Brotemarkle did not remember whether he ever discussed his concerns with McCarns, and he did not know whether McCarns changed his "spiel."  *Id*. at 73-74.  He testified that McCarns "was the primary contact to the person in foreclosure" and that Ed Shaffer "was the person in charge of the underwriters as well as the person – the persons who worked with the brokers."  *Id*. at 55, 75-76.

Brotemarkle testified that he hired Wagner, and that he was Wagner's manager when he first hired him.  ECF No. 557 at 121.  Brotemarkle testified that he did not train people on the Funding Foreclosures program, *id*. at 186-87, and specifically that he did not train Scott Wagner on the Funding Foreclosures program.  *Id*. at 193.  However, with respect to training Domonic McCarns, Brotemarkle had the following exchange with McCarns' trial counsel:

44

1   Q.      And you're saying that you did not train Domonic McCarns in the Funding Foreclosures program?  Yes or no, sir?

2

3   A.      Please be specific.  Because when you say the Funding Foreclosures program, are you referring to how the brokers were responding and –

4

5   Q.      Okay.  When I asked you about Scott Wagner –

    A.      Yeah.

6

7   Q.      -- did you train Scott Wagner regarding the Funding Foreclosures program?

8   A.      Again –

9          MR. ANDERSON:  Objection.  Vague as to which aspect of the program.

10

    Q.      BY MR. GREINER:  Let's start with the whole thing.

11

    A.      I –

12

13         THE COURT:  Answer that question to the extent you're able.

14         THE WITNESS:  I'm sure I informed them of the entire program, how the brokers were responding, et cetera.

15

    Q.      BY MR. GREINER:  I didn't want "them."  I specifically

16  asked you about Scott Wagner.

17  A.      Scott Wagner, yes.

18  Q.      Did you train Scott Wagner about how to talk to the homeowners?

19

    A.      No, I did not.

20

21  Q.      Okay.  Beverly Rocheleau, did you train her regarding how the brokers were responding?

22  A.      Yes.

23  Q.      Well, but she didn't talk to the brokers, did she, that was Ed Shaffer's job?

24

25  A.      I thought it was important for people to understand what the origin of the application they were talking to was.

26  Q.      I understand that.  Ed Shaffer's job was to talk to the brokers, correct?

27

28  A.      Correct.

45

1

Q.      Beverly Rocheleau's job was not to talk to the broker's [sic], correct?

2

A.      Correct.

3

Q.      Scott Wagner's job was not to talk to the brokers, correct?

4

A.      That's correct.

5

Q.      Domonic McCarns' job was not to talk to the brokers, correct?

6

7

A.      Correct.

8  ECF No. 557 at 193-95.  Brotemarkle also testified that he was in charge of marketing to brokers

9  to get them to call into the program.  ECF No. 558 at 22.  He acknowledged that he had

10  developed an approach of "compartmentalizing various departments in the Funding Foreclosures"

11  program and that the program had "dramatically changed how it looked" between March 2005

12  and July/August 2005.  *Id*. at 24.  Brotemarkle defined "underwriters" as people who sold the

13  Funding Foreclosures program to homeowners, and not underwriters in the "traditional bank

14  sense."  *Id*. at 27.  He testified that Domonic McCarns was one of the "underwriters."  *Id*. at 27-

15  28.  He testified that he did not run the office.  *Id*. at 61.  He testified that he did not provide the

16  sales agents with a script, but he believed there was one.  *Id*. at 72.

17          Brotemarkle testified Wagner was an underwriter, "the person working directly

18  with the persons in foreclosure."  ECF No. 557 at 65.  He hired Wagner under Head Financial

19  Services.  *Id*. at 187.  Head Financial Services ceased to operate completely in May 2005.  *Id*.

20  McCarns came over to work for Funding Foreclosures in May 2005 when Head Financial closed.

21  *Id*. at 192.  McCarns was doing loans and refinances for Head Financial.  ECF No. 558 at 15.

22  Brotemarkle testified Todd Hickman was an account manager and worked with the brokers.  *Id*. at

23  66.

24          At his deposition, McCarns' trial counsel testified that based on the circumstances

25  and his understanding of the law, he did not believe a motion for compelled immunity would be

26  granted and therefore he did not make the motion..  Greiner Dep. at 249-50.  After reviewing the

27  record, the court finds this was a reasonable decision.  Neither Wagner's testimony nor

28  Hickman's testimony would have "directly contradicted" Brotemarkle's testimony in such a way

1   that failure to provide immunity to either Wagner or Hickman distorted the fact-finding process in

2   a fundamentally unfair way.  First, Brotemarkle testified that he did manage the mortgage office

3   side of Head Financial Services for several months in early 2005.  ECF No. 557 at 37.  For this

4   reason, it is not at all clear that Hickman's testimony would have contradicted Brotemarkle's.

5   Brotemarkle also testified that he managed Wagner when he first hired him.  Even if it is a

6   reasonable inference from Brotemarkle's testimony that Brotemarkle did not manage the sales

7   agents in the Funding Foreclosures program, including Wagner and McCarns, Wagner's

8   testimony he did would not have been so contradictory as to render the trial fundamentally unfair.

9   Brotemarkle's testimony suggests he was sufficiently aware of McCarns' role in the Funding

10   Foreclosures program, and the "spiel" McCarns was using with homeowners to bring concerns

11   about McCarns to Charles Head's attention.

12          Defendant also argues that Wagner's testimony would have directly contradicted

13   Kou Yang's testimony that "underwriters" handled the fraudulent loans.[14]  Yang testified that

14   "[t]he salespeople were, in a sense, they were loan officers because the loan officers actually

15   made the sales, so they are one and the same."  ECF No. 549 at 79.  With respect to McCarns,

16   Yang testified as follows:

17          Q.     BY MR. MORRIS:  Using individual names, what did you
       observe individual loan officers doing?
18

19          A.     Well, one salesperson that I know is Domonic McCarns.  He
       was in the Costa Mesa office, and he would take the leads that
20     would come over the internet, and he would call the homeowners,
       and he would pitch a sale to them.

21          Q.     Did you have the opportunity to observe Domonic
       McCarns' portion of those phone calls?
22

23          A.     Yes, I have heard phone calls that he has made before.

24          Q.     What did you hear?

25          A.     I would hear him calling the homeowners, and, you know,
       asking them, you know, did you inquire about saving your home,
26     and whatever they said.  Then he would go on to say, well, we have

27   _____

       [14] At all of the pages cited by defendant, Yang referred to "loan officers," not
28   "underwriters."  See ECF No. 712 at 102 and transcript pages cited therein.

47

1    a program that you – that you may qualify for, and, you know, we
     can go over all the things, and then he went into his pitch.
2
     . . .
3
     A.     Okay.  The loan officer, Domonic McCarns, I have heard
4    him say:  We will take the loan, and we'll have an investor
     purchase the property in their name.  You remain in the property for
5    a duration of a year until your credit is fixed.  And then during that
     time, you pay rent to us.  And then after a year, you can purchase
6    the property back.

7    ECF No. 549 at 80-81.  She also testified that McCarns was involved in "overstating income on

8    loan applications."  ECF No. 550 at 76.  On cross-examination, Yang testified that none of

9    several people, including McCarns and Wagner, had anything to do with loan applications.  ECF

10   No. 550 at 157.  She also clarified that the "loan officers" in Head's company were "actually

11   telephone sales agents" who sold the product to homeowners.  *Id*. at 161.  It is unclear how

12   Wagner's testimony that he had "nothing to do with loan documents" would have contradicted

13   Yang's testimony in any way that rendered defendant's trial fundamentally unfair.

14          For the foregoing reasons, a motion to compel immunity for Wagner and Hickman

15   would have been unsuccessful.  Trial counsel's failure to move to compel immunity for Wagner

16   or Hickman was therefore not ineffective.  *See United States v. Moore*, 921 F.2d 207, 210 (9th

17   Cir. 1990).

18   III.   CONCLUSION

19          In accordance with the above, IT IS HEREBY CONFIRMED that defendant's

20   June 23, 2015 motion for new trial, ECF No. 712, is DENIED, as ordered from the bench on June

21   29, 2016.

22   DATED:  July 29, 2016.

23
24   _____
     UNITED STATES DISTRICT JUDGE
25
26
27
28
                                      48